UNITED STATES v. TRILLING et al.

No. 10051.

District Court, E. D. Pennsylvania.

Sept. 17, 1943.

Gerald A. Gleeson, U. S. Atty., and Edward A. Kallick, Asst. U. S. Atty., both of Philadelphia, Pa., Tom C. Clark, Asst. Atty. Gen., Walker Smith, Sp. Asst. to Atty. Gen., and Bert C. Dedman, Jr., Sp. Atty. to Atty. Gen., for the Government.

Shapiro & Shapiro, of Philadelphia, Pa., for defendants.

KALODNER, District Judge.

Defendants have moved to quash an information charging them with violations of the Second War Powers Act 1942, March 27, 1942, Public Law 507, ch. 199, 77th Cong., Second Sess., 50 U.S.C.A. Appendix, § 631 et seq.

The violations charged were sales and deliveries of refrigerating equipment contrary to the provisions of General Limitation Order L-38, as amended, promulgated pursuant to the powers conferred by the Second War Powers Act, 1942, upon the President of the United States and by him vested in the Chairman of the War Production Board.

General Limitation Order L-38, as amended June 18, 1942[1] "froze" sale and distribution of refrigerating and air conditioning equipment.

On March 27, 1943 the Order was further amended, effective April 6, 1943, eliminating the "freeze" provisions previously allegedly violated by the defendants.

The amendment of March 27, 1943 contained the following saving clause: "(6)

(i) *Effective date.* This order, as amended, shall become and be effective on and after April 6, 1943. *It shall not affect, in any way, any liabilities or penalties accrued or incurred under General Limitation Order L-38 prior to this amendment.*" (Emphasis supplied.)

Parenthetically it may be stated that the violation of the "freeze" order occurred in the latter part of June and in the months of July and August 1942. The information under consideration was filed September 30, 1942.

The motion to quash is premised on the defendants' contention that since the freezing provisions of General Limitation Order L-38 were cancelled by the amendment of March 27, 1943, that the penalty provisions of the Second War Powers Act of 1942 can no longer be enforced.

Section 2(a) (5) of Act June 28, 1940, as amended by section 301(5) of the Second War Powers Act, 50 U.S.C.A. Appendix § 633(5), provides: "Any person who willfully performs any act prohibited, or willfully fails to perform any act required by, any provision of this subsection (a) or any rule, regulation, or order thereunder, whether heretofore or hereafter issued, shall be guilty of a misdemeanor, and shall, upon conviction, be fined not more than $10,000 or imprisoned for not more than one year, or both."

In support of their contention defendants rely on the common-law rule that after the expiration or repeal of a law no penalty can be enforced nor punishment inflicted for violations of the law committed while it was still in force. Defendants also rely on United States v. Chambers, 291 U.S. 217, 54 S.Ct. 434, 78 L.Ed. 763, 89 A.L.R. 1210, and McClure et al. v. United States, 3 Cir., 70 F.2d 519.

---

[1] General Limitation Order L-38 as amended June 18, 1942 provided inter alia:

"1071.1(c)

"(1) Except to fill a Preferred Order, or as provided in paragraph (c) (2) hereof, no Producer, dealer or other authorized channel of distribution (including a bottler of carbonated beverages and a manufacturer of ice cream for resale) of Refrigerating and Air Conditioning Equipment shall, after the effective date of this Order, install any unused Refrigerating and Air Conditioning Equipment and no Producer, dealer or other authorized channel of distribution shall sell, lease, trade, lend, deliver, ship or transfer any such unused equipment except to other produc-

ers, dealers or other authorized channels of distribution for resale; and no person (with the exception of other producers, dealers or other authorized channels of distribution for resale) shall accept any sale, lease, trade, loan, delivery, shipment, transfer or installation of any unused Refrigerating and Air Conditioning Equipment.

"(2) Notwithstanding the provisions of paragraph (c) (1) hereof, any Producer, dealer or other authorized channel of distribution may make, and any person may accept, any sale, lease, trade, loan, delivery, shipment, transfer or installation of any material or parts to be used in Emergency Repair Service."

In the Chambers case the Government appealed from a judgment of the United States District Court of the Middle District of North Carolina dismissing an indictment for violating and conspiracy to violate the National Prohibition Act, 27 U.S.C.A. § 1 et seq. United States v. Gibson, 5 F.Supp. 153. The Supreme Court of the United States in affirming the action of the District Court stated (291 U.S. at pages 222, 223, 54 S.Ct. at page 435, 78 L.Ed. 763, 89 A.L.R. 1210): "* * * The continuance of the prosecution of the defendants after the repeal of the Eighteenth Amendment, for a violation of the National Prohibition Act * * * alleged to have been committed in North Carolina, would involve an attempt to continue the application of the statutory provisions after they had been deprived of force. This consequence is not altered by the fact that the crimes in question were alleged to have been committed while the National Prohibition Act was in effect. The continued prosecution necessarily depended upon the continued life of the statute which the prosecution seeks to apply. In case a statute is repealed or rendered inoperative, no further proceedings can be had to enforce it in pending prosecutions unless competent authority has kept the statute alive for that purpose. * * *"

In the McClure case the United States Circuit Court of Appeals for this Circuit set aside the conviction of the defendants and ordered their discharge on the authority of the Chambers case.

The defendants urge that the Chambers and McClure cases are controlling. Secondly the defendants contend that the War Production Board is merely a regulatory body with authority to make or revoke regulations and that the Board is without authority to declare what act shall or shall not constitute a crime or offense. This argument is directed at the provision of the saving clause of March 27, 1943 of General Limitation Order L-38 which provided that "This Order * * * shall not affect in any way any liabilities or penalties accrued or incurred under General Limitation Order L-38 prior to this amendment."

I cannot subscribe to the defendants' contentions. In my opinion the Chambers and McClure cases are not dispositive of the issues here involved. In the instant case the Second War Powers Act under which the information was lodged has not been repealed as was the Eighteenth Amendment by the ratification of the Twenty-first Amendment in the Chambers and McClure cases. As the Supreme Court pointed out in the Chambers case, 291 U.S. at page 222, 54 S.Ct. at page 435, 78 L.Ed. 763, 89 A.L.R. 1210: "Upon the ratification of the Twenty-First Amendment, the Eighteenth Amendment at once became inoperative. Neither the Congress nor the courts could give it continued vitality. The National Prohibition Act, to the extent that its provisions rested upon the grant of authority to the Congress by the Eighteenth Amendment, immediately fell with the withdrawal by the people of the essential constitutional support. * * *"

In my opinion so long as the Second War Powers Act continues in force violators of any of its provisions may be prosecuted and brought to judgment. Amendment or even revocation of a violated regulation promulgated by a lawful agency under the authority of the Second War Powers Act cannot act as a repealer of the Act.

It is clear that in the enactment of the Second War Powers Act Congress intended to create a fluid method of meeting wartime emergencies and necessities. Primarily, the "Priorities Powers" provisions of the Second War Powers Act as set forth in Title 3, 50 U.S.C.A. Appendix § 633, were designed to permit a system of utmost flexibility in meeting wartime requirements "in the supply of any material or of any facilities for defense * * *" etc.

The dislocation of sources of supplies incident to a war-time economy 'makes imperative a maximum flexibility and fluidity in the administration of any regulatory priorities procedure.

Evidencing Congressional recognition of the compelling urgency of flexibility, the War Securities Act empowered agencies created under its provisions to make rules and regulations, and further in Section 2 (a) (5), provided penalties for violation of such rules and regulations.

The very language of Section 2(a) (2) very forcefully emphasizes the intent of the Congress to grant the most flexible powers to the President and subordinate agencies with respect to the assignment of priorities to the allocation of material. Section 2(a) (2) provides: "* * * *Whenever* the President is satisfied that the fulfillment of requirements for the defense of the Unit-

846

ed States will result in a shortage in the supply of any material or of any facilities for defense or for private account or for export, the President may allocate such material or facilities *in such manner, upon such conditions* and *to such extent* as he shall deem *necessary* or *appropriate* in the public interest and to promote the national defense." (Emphasis supplied.)

Again in Section 2(a) (8) the President is empowered to exercise his powers "in conformity with any rules or regulations which he may prescribe." Section 2(a) (8) provides: "The President may exercise any power, authority, or discretion conferred on him by this subsection (a), through such department, agency, or officer of the Government as he may direct and in conformity with *any rules or regulations* which he may prescribe." (Emphasis supplied.)

In discussing the problem here involved it must be kept in mind, however, that it is the Act and not the rules and regulations which establishes the crime and fixes the penalties.

■ The Supreme Court of the United States in United States v. Grimaud, 220 U.S. 506, at pages 517, 519, 522, 31 S.Ct. 480, at page 483, 55 L.Ed. 563, in upholding the constitutionality of a statute authorizing the promulgation of certain administrative regulations and making their violation a crime, said:

" * * * From the beginning of the government, various acts have been passed conferring upon executive officers power to make rules and regulations,—not for the government of their departments, but for administering the laws which did govern. None of these statutes could confer legislative power. But when Congress had legislated and indicated its will, it could give to those who were to act under such general provisions 'power to fill up the details' by the establishment of administrative rules and regulations, the violation of which could be punished by fine or imprisonment fixed by Congress, or by penalties fixed by Congress, or measured by the injury done. * * *

"That 'Congress cannot delegate legislative power is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution.' Marshall Field & Co. v. Clark, 143 U.S. [649], 692, 12 S.Ct. 495, 36 L.Ed. 309. But the authority to make administrative rules is not a delegation of legislative power, nor are such rules raised from an administrative to a legislative character because the violation thereof is punished as a public offense. * * *

"A violation of reasonable rules regulating the use and occupancy of the property is made a crime, not by the Secretary, but by Congress. The statute, not the Secretary, fixes the penalty. * * * "

The point at issue, in my opinion, is controlled by the decision of the United States in United States v. Curtiss-Wright Export Corporation, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255.

In that case Congress, by Joint Resolution on May 28, 1934, 48 Stat. 811, empowered the President to prohibit by proclamation, sales of arms and munitions to countries engaged in armed conflict in the Chaco. The Joint Resolution further provided that violation of the Presidential Proclamation should be punishable by fine or imprisonment or both.

On the same date that the Joint Resolution was adopted the President issued a Proclamation prohibiting sale of arms and ammunition to Bolivia and Paraguay, No. 2087, 48 Stat. 1744. Subsequently, on November 14, 1935 the President, by proclamation, No. 2147, 49 Stat. 3480, revoked the proclamation of May 28, 1934 as to sale of arms and munitions to Bolivia and Paraguay after November 29, 1935, "provided, however, that this action shall not have the effect of releasing or extinguishing any penalty, forfeiture or liability incurred under the aforesaid Proclamation of May 28, 1934, or the Joint Resolution of Congress approved by the President on the same date."

The defendants in the Curtiss-Wright case were indicted for conspiracy to sell arms of war in violation of the Joint Resolution and of the Presidential Proclamation thereunder, during the pendency of the Proclamation of May 28, 1934. The defendants demurred to the indictment on the ground that the President had revoked his Proclamation prior to the return of the indictment.

In its opinion the Supreme Court specifically ruled that the revocation of the original Proclamation did not relieve the defendants of liability for offenses committed while it had been in effect. Said the Court, 299 U.S. at pages 331, 332, 57 S.Ct. at page 226, 81 L.Ed. 255:

"It was not within the power of the President to repeal the Joint Resolution; and his second proclamation did not purport to do so. It 'revoked' the first proclamation; and the question is, did the revocation of the proclamation have the effect of abrogating the resolution or of precluding its enforcement in so far as that involved the prosecution and punishment of offenses committed during the life of the first proclamation? We are of opinion that it did not.

"Prior to the first proclamation, the Joint Resolution was an existing law, but dormant, awaiting the creation of a particular situation to render it active. No action or lack of action on the part of the President could destroy its potentiality. Congress alone could do that. The happening of the designated events—namely, the finding of certain conditions and the proclamation by the President—did not call the law into being. It created the occasion for it to function. *The second proclamation did not put an end to the law or affect what had been done in violation of the law. The effect of the proclamation was simply to remove for the future a condition of affairs* which admitted of its exercise.

"We should have had a different case if the Joint Resolution had expired by its own terms upon the issue of the second proclamation. Its operative force, it is true, was limited to the period of time covered by the first proclamation. *And when the second proclamation was issued, the resolution ceased to be a rule for the future. It did not cease to be the law for the antecedent period of time.* \* \* \*" (Emphasis supplied).

The amendment of the "freeze" provisions in General Limitation Order L-38 in this case is similar to the amendment of the original Presidential Proclamation in the Curtiss-Wright case, and what was said in that case with respect to the effect of the amendment there applies with equal force to the amendment in Order L-38.

Paraphrasing the statement above of the Supreme Court with respect to the second Proclamation, "The second amendment did not put an end to the law (The Second War Powers Act) or affect what had been done in violation of the law."

As pointed out in the Government's brief, the War Production Board has issued more than 500 regulations, followed by hundreds of revisions and amendments promulgated as changing conditions dictated such revision or amendment. Mention is made of this fact since it strikingly illustrates the flexibility and fluidity of the Board's functioning. Such flexibility and fluidity in administration, as has been stated, was intended by the Congress and we must give effect to that intention.

For the reasons stated the defendants' motion to quash the information must be denied. Accordingly I make the following order:

The motion to quash the information is denied.