**FREDRICK et al. v. UNITED STATES.**

No. 11259.

Circuit Court of Appeals, Ninth Circuit.

July 18, 1947.

Writ of Certiorari Denied Oct. 13, 1947.

See 68 S.Ct. 87.

Abraham Gottfried, of Los Angeles, Cal., for appellant.

James M. Carter, U. S. Atty., Ernest A. Tolin and William Strong, Asst. U.S. Attys., all of Los Angeles, Cal., for appellee.

Before GARRECHT, STEPHENS and ORR, Circuit Judges.

GARRECHT, Circuit Judge.

On January 22, 1946, the appellants were jointly charged, in a criminal information containing eleven counts, with violation of the Second War Powers Act of March, 1942, 50 U.S.C.A.Appendix, § 633. Six of the eleven counts alleged the unlawful and willful acquisition, possession and control of "counterfeit and forged ration coupons, purporting to represent * * * ration points of the type used for meats, fats, fish and cheese, and purporting to be valid for the month of May, 1945". Four counts charged illegal use of such coupons, and the eleventh count set forth that the appellants had unlawfully acquired, possessed, and controlled counterfeit and forged ration coupons purporting to represent Stamp No. 36 of War Ration Book No. 4, "each purporting to be valid for five pounds of sugar for the month of May, 1945".

The appellants filed a demurrer, a motion to quash, and a motion for a bill of particulars, each of which was denied.

After presenting its evidence, the appellee moved to amend the information so as to substitute the words "ration documents" for the words "ration coupons" wherever the latter appeared in the infor-

mation. Claiming surprise, the appellants objected, but the court below permitted the appellee to amend.

"In the interest of expediency", the appellee voluntarily dismissed four counts. After the court had expressed the view that "the evidence is insufficient to tie these defendants into the depositing of any of the ration coupons", the appellee dismissed four more counts. This left only Counts 9, 10, and 11 to be considered by the jury.

After setting forth the jurisdictional basis for the prosecution and the various provisions of General Ration Order No. 8 that the appellants are alleged to have violated, the three counts are in substance as follows:

9. On or about May 1, 1945, in Los Angeles, the appellants willfully and unlawfully acquired, possessed, and controlled 6,000 counterfeit and forged ration documents, purporting to represent approximately 60,000 ration points of the type used for meats, etc., and purporting to be valid during May, 1945, which were not acquired, etc., by the appellants personally or as agents for another, in accordance with Revised Ration Order No. 16, or any other ration order, for the reason that said documents were not issued to them, but were acquired by the appellants without the transfer therefor at any time of foods covered by said Order No. 16, and had been purchased by the appellants.

10. On or about May 20, 1945, the appellants acquired, etc., approximately 20,000 counterfeit and forged ration documents, purporting to represent about 200,000 ration points of the type used for meats, etc., and purporting to be valid for May, which were not acquired, etc., by appellants personally, etc., in accordance with Order No. 16, etc., for the reason that the documents were not issued to the appellants, etc., but were acquired by them without the transfer therefor at any time of foods, etc., and had been purchased by them.

11. On or about May 28, 1945, the appellants acquired, etc., about 3503 counterfeit and forged ration documents, purporting to represent Stamp No. 36, etc.,

and each purporting to be valid for five pounds of sugar during May, which documents were not acquired by the appellants personally, etc., in accordance with Second Revised Ration Order No. 3, or any other ration order, since the documents were not issued to the appellants, etc., but were acquired by the appellants without the delivery and transfer of any sugar therefor, and were purchased by the appellants.

At the close of the appellee's case, counsel for the appellants moved that these three counts be dismissed as to the appellant Gilbert. In their brief, counsel refer to that motion as being also one for a "directed verdict". Technically, the assumption is not accurate, but we do not make a point of it.

The appellants at the same time moved to strike the same three counts, presumably as to both Fredrick and Gilbert.

▮ Both motions were denied. It is to be observed that they were not made at the close of all the evidence. In so far as the motions are to be construed as being for a directed verdict, they should have been thus made. Hansen v. Boyd, 161 U.S. 397, 402, 403, 16 S.Ct. 571, 40 L.Ed. 746; Bank of Italy v. F. Romeo & Co., 9 Cir., 287 F. 5, 7; Milleson v. United States, 8 Cir., 78 F.2d 60; Nailling v. United States, 6 Cir., 124 F.2d 431, certiorari denied, 316 U.S. 675, 62 S.Ct. 1043, 86 L.Ed. 1749, petitions for rehearing denied, 316 U.S. 710, 711, 62 S.Ct. 1267, 86 L.Ed. 1776, petition for rehearing denied, 6 Cir., 142 F.2d 551; Minnehaha County, S. D. v. Kelley, 8 Cir., 150 F.2d 356, 359, 360.

Despite this defect in the appellants' presentation of their contention that the evidence was insufficient to sustain the verdict, in the interest of complete fairness we will hereinafter consider that question. In view of that same objection of the appellants', we will limit our statement of facts to a summary of the appellee's evidence.

Theodore Freeman, the appellants' office manager, testified that they operate two markets, the Hollywood Ranch Market and Bill's Ranch Market. Each market maintains a meat department and a grocery department, which the appellants themselves

operate. The witness had charge of depositing the ration coupons, writing the checks, and balancing the accounts. Gilbert was "primarily" the grocery manager and buyer, and Frederick was "primarily" meat buyer for the partnership. The ration coupons or stamps were deposited in the Hollywood State Bank.

Alma E. Keevy, who had supervision over ten girls at the Verification Center of the Office of Price Administration at San Francisco, said that the Center "is a place where all of the used ration currency comes back to and is checked for all irregularities". It checks coupons coming out of all the Western States, including California, which are sent in by registered mail from the various banks. She explained and demonstrated the use of a fluorescent lamp in detecting counterfeit stamps. She testified that she had so tested all the stamps in certain envelopes in evidence in this case, and could tell by notations on the envelopes containing them how many she had found to be genuine and how many were counterfeit. According to her testimony, an overwhelming majority of the stamps in those envelopes were counterfeit.

On cross-examination, Miss Keevy was asked by appellants' counsel whether she had not discussed the validity of the coupons in this case, before coming into court. She made the following damaging reply: "No, I did not discuss it with anyone other than my boss. When we find a terrific amount of bad stamps, as this market produced, up there, well then, I naturally would take anything quite as large to my boss."

Harriet Welling, ration teller of the Hollywood State Bank, said on the stand that in 1945, probably in May, she turned over to Thaddeus R. Loud, special agent of the Currency Protection Branch of the Office of Price Administration, a group of deposit envelopes that were in the bank at that time, all of which envelopes came from the Hollywood Ranch Market. She took the envelopes to the directors' room and she and Loud examined them. Loud explained "with the lamp" "how the good ones looked and how the bad ones looked."

Later, Loud himself testified that he had examined "every one" of the stamps in every envelope in Government's Exhibit 34—which Miss Welling had identified as being made up of envelopes that had come from the Hollywood Ranch Market. Loud said that of the 210,000 "points" contained in the envelopes endorsed by the bank with the date of May 24, 138,450 were counterfeits; and that "there were 200,000 points bearing * * * the bank endorsement dated May 18th, and of those 200,000 points contained in those envelopes, 110,170 are counterfeits".

Max Jones, one of the principle witnesses for the appellee, was also referred to by witnesses and by counsel as "Dick" Jones. Twice in their brief, the appellants seek to make a point of this variance in name, characterizing it as "noteworthy". Whether the appellants seek to cast a doubt on the identity of Jones, is not clear. At any rate, the point was not raised at the trial, when it could easily have been cleared up, and our own careful study of the record convinces us that counsel for both sides and all the witnesses who referred to Jones knew that Max Jones and "Dick" Jones are one and the same man. In examining his own witnesses, counsel for the appellants himself referred to Max Jones as "Dick" Jones, while in the appellants' brief the preferred designation is Max Jones. It is clear that for the purposes of this case, the two names are interchangeable.

Jones gave his residence as the Los Angeles County Jail, and said that he was incarcerated there following a conviction for felony in connection with gasoline rationing stamps. He testified that in 1945, probably during the first week in April, he had had a conversation with the appellant Gilbert at the Bill's Ranch Market in Burbank; that Gilbert asked him whether he "knew where they could get meat stamps"; that the witness told Gilbert that he didn't know but would find out; and that Gilbert said "he could use some" if the witness "could get some".

A few days later, Jones said, he and Gilbert met again. Jones introduced him to Al Becker and Mert Powell, told him

that they had some stamps, and then departed, according to the testimony.

A third conversation between Gilbert and Jones was held about a month or six weeks later, Jones testified, giving the substance of that conversation as follows: "They had been questioned about the stamps, their stamps or their rationing account, and the complaint was that the stamps that they had gotten from Becker were supposedly all right and had turned out to be counterfeits or invalid stamps."

Jones said that Gilbert told him "that his partner, Fredrick, knew more about it", and that, accordingly, Jones went to see Fredrick. The witness was not sure whether the Fredrick that he talked to was the appellant Fredrick or the latter's brother, but he believed that it was the appellant Fredrick.

Allen Becker testified that he had a conversation with Gilbert "around the end of March", 1945, in the presence of "Dick" Jones and Powell. Jones told Gilbert that Becker "might be able to locate some ration points for him", and asked him how many he needed, according to Becker, who quoted Gilbert as replying, "Approximately 100,000".

About two weeks later, Becker went to Gilbert with "A package of points", "and he said I had better contact Fredrick at the Hollywood Ranch Market," according to Becker's testimony. Becker also testified that he went to see Fredrick and told him that those were the points he wanted, and that "he checked them". Becker continued: "He took some of them out and looked at them and he said he didn't know what they were, whether they were good or bad or what they were, and I said, 'Well, if they are,' I said, 'you will have to find out—if they are not genuine. I don't want anything to do with it and neither do you,' and he said he would check, so I left some of the stamps there."

There were 100,000 points in the "package" that Becker had with him, he testified. The stamps were in envelopes, and Fredrick opened two or three of them.

Several days later, Becker telephoned to Fredrick to inquire whether the latter had found anything about the stamps, and Fredrick answered, "No, not yet", according to Becker.

"A couple of weeks" after leaving the stamps with Fredrick, or "in the early part of April", Becker, according to his testimony, left some envelopes—he said he believed there were eleven of them—with Fredrick, who "just counted the envelopes and paid for them." There were "supposed to be" 500 stamps in each envelope, or 55,000 points in all, Becker said, each stamp purporting to be worth 10 points. Becker added that there might have been 60,000 points in the envelopes, since he thought he received $600 for them.

Several weeks later, in another conversation, probably by telephone, Fredrick informed Becker that "They wanted more stamps", Becker testified. Becker took the stamps to Fredrick, in probably 40 envelopes, each containing 5,000 points, for which Becker testified that he was paid "around $2,000.00" in currency by Fredrick. All the stamps left with Fredrick by Becker were red stamps, Becker said, except that the last time there was also one envelope of sugar stamps, which Fredrick said "they could use".

Several weeks later, according to Becker's testimony, he went to the store and Fredrick told him that he had found out that "the stamps weren't any good" and "he said something about getting his money back". "I asked him where he thought I would get it when I didn't even know who it was who brought them. * * * I told him if the party contacted me that contacted me before I would tell him about it—that that was all I could do."

The jury returned a verdict of guilty as to both appellants on all three counts, with a recommendation for leniency in favor of the appellant Gilbert. From judgments based upon that verdict, the present appeal has been taken.

The applicable paragraph of 50 U.S.C.A. Appendix, § 633, supra, reads as follows: "(a) * * * (5) Any person who willfully performs any act prohibited, or willfully fails to perform any act required by,

any provision of this subsection (a) or any rule, regulation, or order thereunder, whether heretofore or hereafter issued, shall be guilty of a misdemeanor, and shall, upon conviction, be fined not more than $10,000 or imprisoned for not more than one year, or both."

The pertinent sections of the applicable ration orders as they stood at the time the offenses were committed are copied below.[1]

[1] General Ration Order No. 8, 8 F.R. 3783, as amended in 9 F.R. 402, 9 F.R. 1325, and 9 F.R. 2746, was in part as follows:

"Sec. 1.2 *Definitions.* When used in this order:

\* \* \* \* \* \*

" 'Ration document' means an authorization, *stamp*, stamp card, stamp envelope, ration book, *coupon*, coupon sheet, token, ration check, certificate, clearance statement, receipt and acknowledgment; \* \* \*.

"Sec. 2.5 *Acquisition, use, transfer or possession of counterfeited or forged ration document.* No person shall acquire, use, permit the use of, transfer, possess or control any counterfeited or forged ration document under circumstances which would be in violation of section 2.6 if the document were genuine or if he knows or has reason to believe that it is counterfeited or forged.

"Sec. 2.6 *Acquisition, use, transfer, or possession of ration document.* No person shall acquire, use, permit the use of, transfer, possess or control a ration document except the person or the agent of the person to whom such ration document was issued or by whom it was acquired in accordance with a ration order or except as otherwise provided by a ration order. No person shall use or transfer a token or other ration document except in a way and for a purpose permitted by a ration order." [Emphasis supplied.]

The text of Revised Ration Order No. 16, including Amendments 1 to 49, 10 F.R. 3317, 3861, 3867, 3869, was in part as follows:

"Sec. 20.1 *Additional prohibitions.* (a) No 'person' shall use points unless he has received them in a way permitted by this or any other order of the Office of Price Administration.

"(c) No person shall give or transfer points, a 'stamp', 'token', or a 'certificate' to any other person, except in way permitted by this or any other order of the Office of Price Administration.

"(e) No person shall have a stamp, token, certificate or ration check in his possession except the person (or agent of the person) to whom it was issued or by whom it was acquired in a way permitted by this or any other order of the Office of Price Administration.

\* \* \* \* \* \*

"(g) No person shall counterfeit, forge, or alter a stamp, token, certificate, credit, authorization, or ration check, and no person shall transfer, acquire, possess, or use a counterfeited, forged or altered stamp, token, certificate, credit authorization or ration check.

\* \* \* \* \* \*

"(i) No person shall offer, solicit, attempt or agree to do, or assist in doing any act in violation of this order.

\* \* \* \* \* \*

"Sec. 27.1 *Definitions.* (a) When used in this order:

" 'Acquire' means to accept a 'transfer' or to get possession or title in any other way.

" 'Person' means not only an individual, but also a partnership, corporation, association or business trust. It includes a government, government agency and any other organized group or enterprise.

\* \* \* \* \* \*

" 'Transfer' means to sell, give, exchange, lend, deliver, or consign. It includes any transfer of possession or title, however accomplished, and any movement of goods from one establishment to another. The use by any 'person' of foods covered by this order which he produced or holds for sale or transfer is considered a transfer of those foods to himself. Where foods ordered by a transferee are delivered by the transferor to a common or contract carrier for shipment and delivery by the carrier or a connecting common carrier to the transferee (whether or not actually consigned to the transferee), and no transfer of the foods to the transferee has previously occurred, the foods are considered to be transferred at the time when they are delivered to the carrier. However, delivery to a common or contract carrier for shipment is not regarded as a transfer to the carrier; and delivery by the carrier to the consignee is not regarded as a transfer by the carrier."

Second Revised Ration Order No. 3, 9 F.R. 13641, 13662, contained the following provisions:

"Sec. 17.14 *Prohibited deliveries.* (a) Notwithstanding the terms of any contract, agreement or commitment, regardless of when made, on and after June 19, 1942, except as otherwise ex-

The fourteen specifications of error urged by the appellants will be considered seriatim.

1. *"The information should have been dismissed since it was filed after Revised Ration Order No. 16 was revoked."*

The appellants point out that the order in question was revoked on November 23, 1945, effective the next day (10 F.R. 14436). The information was filed on January 22, 1946.

There is no merit in this contention. In United States v. Hark, 320 U.S. 531, 536, 64 S.Ct. 359, 362, 88 L.Ed. 290, the court said: *"Third.* We hold that the revocation of the regulation did not prevent indictment and conviction for violation of its provisions at a time when it remained in force. The reason for the common law rule that the repeal of a statute ends the power to prosecute for prior violations is absent in the case of a prosecution for violation of a regulation issued pursuant to an existing statute which expresses a continuing policy, to enforce which the regulation was authorized. Revocation of the regulation does not repeal the statute; and though the regulation calls the statutory penalties into play, the statute, not the regulation, creates the offense and imposes punishment for its violation." See also United States v. Trilling, DC Pa., 51 F. Supp. 843, 845; United States v. Delfrate, DC Pa., 54 F.Supp. 565; United States v. Philipp, DC Pa., 63 F.Supp. 853.

2. *"The court erred in overruling defendants' demurrer and motion to quash."*

Several objections are urged by the appellants under this general heading.

First, it is contended that "the information did not state facts sufficient to constitute a crime against the United States." The chief ground for this objection seems to be that "the appellants were not charged with knowledge of the counterfeit and forged character of the ration currency involved," etc.

Although it might be argued that the allegation that the appellants "did willfully and unlawfully use" the spurious ration documents imported a knowledge of their counterfeit and forged character, we do not labor this point, since such an allegation is not necessary under § 2.5 of General Ration Order No. 8, supra.

It should be observed that the appellants' criticism of the lack of scienter in the information refers only to certain counts that were dismissed—the so-called "use" counts—on the ground that "the demurrer should have been sustained as to those counts, in which event none of the testimony [relating to the deposits] (now urged as prejudicial by Appellants * * *) could have been admitted".

Even as to the dismissed counts, however, an allegation of scienter was not necessary. In support of their position, the appellants cite United States v. Tobin, 7 Cir., 149 F.2d 534, certiorari denied, 326 U.S. 737, 66 S.Ct. 46, 90 L.Ed. 439. That case holds precisely to the contrary, however, as we pointed out in Ruggiero v. United States, 9 Cir., 156 F.2d 976, 977, which was a "use" case. Citing the Tobin decision, we there said: "Knowledge on the part of the appellants that the stamps were counterfeit is not a necessary part of the crime and is, therefore, immaterial."

Again, the appellants object that "the information failed to state the essen-

---

pressly permitted in this order, deliveries of sugar shall be made only by and to, and accepted only by and from institutional user establishments registered under General Ration Order 5, registered consumers, registering units, industrial users registered on OPA Form R-1200, and primary distributors.

"(b) No person, unless expressly permitted by this order or otherwise authorized by the Office of Price Administration, may deliver sugar unless he receives evidence covering the amount of such sugar or accept deliveries of sugar unless he surrenders evidences for that amount of sugar. No person, unless expressly permitted by this order or otherwise authorized by the Office of Price Administration may accept or receive ration evidences unless he delivers sugar covering the amount of the evidences and, unless expressly permitted by this order or otherwise authorized by the Office of Price Administration, no person may surrender evidences except to authorize a delivery of sugar."

tial facts of an offense with sufficient particularity," etc.

We have already summarized the three counts upon which the verdict of guilty was returned. We believe that they charged the offenses with sufficient particularity. The appellants' criticism of these three counts is either microscopic or refers to evidentiary matters.

■ The appellants also maintain that the information failed to inform them as to the law they were alleged to have violated. A reading of the entire information shows that all the necessary applicable statutes and regulations are fully set out; nor do the appellants point to a single provision that has been omitted.

■ It is also urged that the information is duplicitous, in that it charges the crime of acquiring, possessing and controlling "counterfeit *and* forged" ration coupons instead of using the disjunctive "or". The appellants then launch into a discussion of the semantics of "counterfeit" and "forged" that, in our view, is wholly irrelevant.

In Crain v. United States, 162 U.S. 625, 636, 16 S.Ct. 952, 955, 40 L.Ed. 1097, the court said: "The statute was directed against certain defined modes for accomplishing a general object, and declared that the doing of either one of several specified things, each having reference to that object, should be punished by imprisonment at hard labor for a period of not less than five years nor more than ten years, or by imprisonment for not more than five years and a fine of not more than one thousand dollars. We perceive no sound reason why the doing of the prohibited thing in each and all of the prohibited modes may not be charged in one count, so that there may be a verdict of guilty upon proof that the accused had done any one of the things constituting a substantive crime under the statute. And this is a view altogether favorable to an accused, who pleads not guilty to the charge contained in a single count, for a judgment on a general verdict of guilty upon that count will be a bar to any further prosecution in respect of any of the matters embraced by it." See, also, as to the specific charges of "forging *and* counterfeiting", Pines v. United States, 8

Cir., 123 F.2d 825, 828, 829. Cf. United States v. Handler, 2 Cir., 142 F.2d 351, 353, certiorari denied, 323 U.S. 741, 65 S.Ct. 40, 89 L.Ed. 594.

■ Finally, the appellants contend that "the information failed to inform the appellants of the nature and the cause of the accusations against them" in that it failed to "identify" the appellants as "retailers", "wholesalers", or "processors" in charging them with acquisition and possession of ration coupons.

Such an allegation was unnecessary, since, under the food regulations in force at the time of the acts complained of, acquisition or possession by any one of ration documents under the circumstances set forth in the information, was contrary to law.

Moreover, it should be borne in mind that § 2.6 of General Ration Order No. 8 forbids *any* acquisition, etc., of a ration document "except in accordance with a ration order," etc. If the appellants had acquired the ration documents in compliance with any ration order, that fact was peculiarly within their own knowledge, and it was not necessary for the appellee to negative the exception.

In McKelvey v. United States, 260 U.S. 353, 356, 357, 43 S.Ct. 132, 134, 67 L.Ed. 301, the court said: "One ground of objection is that the indictment contains no showing that the accused were not within the exception made in the proviso to section 3. This is not a valid ground. By repeated decisions it has come to be a settled rule in this jurisdiction that an indictment or other pleading founded on a general provision defining the elements of an offense, * * * need not negative the matter of an exception made by a proviso or other distinct clause, whether in the same section or elsewhere, and that it is incumbent on one who relies on such an exception to set it up and establish it. [Cases cited]"

In Morrison v. People of State of California, 291 U.S. 82, 88, 89, 90, 91, 54 S.Ct. 281, 284, 78 L.Ed. 664, Mr. Justice Cardozo said:

"The decisions are manifold that within limits of reason and fairness the burden of

proof may be lifted from the state in criminal prosecutions and cast on a defendant. The limits are in substance these, that the state shall have proved enough to make it just for the defendant to be required to repel what has been proved with excuse or explanation, or at least that upon a balancing of convenience or of the opportunities for knowledge the shifting of the burden will be found to be an aid to the accuser without subjecting the accused to hardship or oppression.

\* \* \* \* \* \*

"For a transfer of the burden, experience must teach that the evidence held to be inculpatory has at least a sinister significance [cases cited], or if this at times be lacking, there must be in any event a manifest disparity in convenience or proof and opportunity for knowledge, as, for instance, where a general prohibition is applicable to every one who is unable to bring himself within the range of an exception. [Authority cited.] The list is not exhaustive. Other instances may have arisen or may develop in the future where the balance of convenience can be redressed without oppression to the defendant through the same procedural expedient. The decisive considerations are too variable, too much distinctions of degree, too dependent in last analysis upon a common sense estimate of fairness or of facilities of proof, to be crowded into a formula. One can do no more than adumbrate them; sharper definition must await the specific case as it arises."

In a case arising under the Emergency Price Control Act, 50 U.S.C.A.Appendix, § 901, et seq., Taylor v. United States, 9 Cir., 142 F.2d 808, 814, certiorari denied 323 U.S. 723, 65 S.Ct. 56, 89 L.Ed. 581, this court observed: "It was not a burden of the Government to negative in the information exceptions which might exculpate the accused from liability under the Act." See also Green, Moore & Co. v. United States, 5 Cir., 19 F.2d 130, 131, certiorari denied, 275 U.S. 549, 48 S.Ct. 86, 72 L.Ed. 420; Williams v. United States, 78 U.S.App.D.C. 147, 138 F.2d 81, 82, 83, 153 A.L.R. 1213; 7 Fifths Old Grand-Dad Whiskey v. United States, 10 Cir., 158 F.2d

34, 36, certiorari denied, 330 U.S. 828, 67 S. Ct. 870, 91 L.Ed. ——; United States v. Sarro, D.C.N.Y., 14 F.Supp. 397, 398.

"A common sense estimate" of the entire language of the three counts here in question will convince one that they are in all respects adequate to charge an offense against the United States.

3. *"The court erred in overruling appellants' motion for a bill of particulars."*

█ The appellants complain that information was "vague, indefinite and uncertain," and that they "were not informed of the names of the persons from whom the ration points were acquired, the method of payments," etc.

It is clear that the appellants are, in reality, objecting that the information did not set forth evidentiary matters. It is hornbook law, however, that neither an indictment nor an information need descend to such minutiæ.

Apposite to this contention of the appellants is the language used in Wong Tai v. United States, 273 U.S. 77, 82, 47 S.Ct. 300, 302, 71 L.Ed. 545:

"3. The defendant also made a motion, supported by affidavit, for a detailed bill of particulars, setting forth with particularity the specific facts in reference to the several overt acts alleged in the indictment, with various specifications as to times, places, names of persons, quantities, prices, containers, buildings, agencies, instrumentalities, etc., and the manner in which and the specific circumstances under which they were committed. This motion—which in effect sought a complete discovery of the Government's case in reference to the overt acts—was denied on the ground that the indictment was sufficiently definite in view of the unknown matters involved and the motion called for 'too much details of evidence.'

"The application for the bill of particulars was one addressed to the sound discretion of the court, and there being no abuse of this discretion, its action thereon should not be disturbed. [Many cases cited.]" Maxfield v. United States, 9 Cir., 152 F.2d 593, 596, certiorari denied, 327

U.S. 794, 66 S.Ct. 821, 90 L.Ed. 1021; see also Zito v. United States, 7 Cir., 64 F.2d 772, 773; Paschen v. United States, 7 Cir., 70 F.2d 491, 493, 494; Pines v. United States, supra, 8 Cir., 123 F.2d at pages 827, 828; Rose v. United States, 10 Cir., 128 F.2d 622, 624, certiorari denied, 317 U.S. 651, 63 S.Ct. 47, 87 L.Ed. 524; United States v. Association of American Railroads, D.C.Neb., 4 F.R.D. 510, 528.

4. *"The court erred in permitting the same offense to be charged in more than one count."*

 Without citing any authority, the appellants complain that "the testimony discloses that the so-called sugar stamps which were the subject of Count Eleven, and the red-point stamps, which were the subject of Count Ten, formed a part of the same transaction." Consequently, they argue, "if there was any offense it was one offense and not two offenses and, therefore, permitting the Government to charge two offenses was contrary to law."

The same transaction may be the subject of more than one count. In Dealy v. United States, 152 U.S. 539, 542, 14 S.Ct. 680, 681, 38 L.Ed. 545, the court used the following language: "It is familiar law that separate counts are united in one indictment, either because entirely separate and distinct offenses are intended to be charged, or because the pleader, having in mind but a single offense, varies the statement in the several counts as to the manner or means of its commission in order to avoid at the trial an acquittal by reason of any unforeseen lack of harmony between the allegations and the proofs. [Authority cited.] Yet, whatever the purpose may be, each count is in form a distinct charge of a separate offense, and hence a verdict of guilty or not guilty as to it is not responsive to the charge in any other count." See also Thomas v. Hudspeth, 10 Cir., 127 F.2d 976, 978; Randall v. United States, 5 Cir., 148 F.2d 234, 235, certiorari denied, 325 U.S. 885, 65 S.Ct. 1579, 89 L.Ed. 2000.

Before leaving the subject of the sufficiency of the information, we might do well to advert to the oft-quoted but oft-ignored statutory admonition—18 U.S.C.A. § 556: "No indictment found and presented by a grand jury in any district or other court of the United States shall be deemed insufficient, nor shall the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant * * *."

While the foregoing section refers specifically to an indictment, the salutary principle underlying it has been extended to criminal pleadings generally. In Hagner v. United States, 285 U.S. 427, 431, 52 S.Ct. 417, 419, 76 L.Ed. 861, the court observed: "The rigor of old common-law rules of criminal pleading has yielded, in modern practice, to the general principle that formal defects, not prejudicial, will be disregarded."

Indeed, the principle has been specifically applied in information cases. Simpson v. United States, 6 Cir., 241 F. 841, 843, 844, certiorari denied, 245 U.S. 664, 38 S.Ct. 62, 62 L.Ed. 537, and the many cases there cited; United States v. Henderson, 73 App.D.C. 369, 121 F.2d 75, 79, and the cases there cited.

5. *"The trial judge erred in denying the appellants' motion to strike the testimony of witnesses Keevy, Welling, and Loud, and the Government's Exhibits 1 to 34, inclusive."*

 We have already given an abstract of the testimony of these three witnesses. That testimony, as well as the appellee's exhibits, all related to ration stamps that had been discovered in the deposits of the Hollywood Ranch Market in the Hollywood State Bank. Of these stamps, a "terrific" number, as we have seen, were counterfeit.

The appellants insist that "it is obvious that the presence of said stamps in the bank deposits cannot in any way be linked with the activities of the Appellants".

We do not agree. The presence of these deposits in the name of the market owned and controlled by the appellants was evidence that might well be taken into consideration by the jury, in connection with the testimony of Jones and Becker that the appellants sought to purchase and did purchase ration stamps. The jury had not

only the right but the duty to consider the entire evidence as a whole. There is no merit in the appellants' contention.

6. *"The court erred in permitting the Amendment of Counts Nine, Ten and Eleven by permitting the words 'ration documents' to be substituted for 'ration coupons' after the Government had virtually completed its case."*

In support of this argument, the appellants assert that "they were caught by surprise", that "the amendment constituted a charge of totally new and distinct offenses," that "the amended language made the information vague, uncertain and ambiguous", and that "the term 'document' is nowhere defined in any of the ration orders".

In this last statement, the appellants are demonstrably in error. In § 1.2 of General Ration Order No. 8, supra, we find, under the caption "Definitions":

"When used in this order:

"'Ration document' means * * * stamp, * * * coupon, * * *."

This very definition negatives the contention that "the amendment constituted a charge of totally new and distinct offenses". "Ration documents" is the generic term that embraces both "coupons", the word originally used in the information, and "stamps", which were shown by the evidence to have been acquired by the appellants. There is no violent change in all this.

The mere assertion that the appellants were "surprised" is not proof. The court has some discretion in such matters.

In Muncy v. United States, 4 Cir., 289 F. 780, 781, the court said:

"* * * we need only observe that it is too well settled to require citation of authority that an information, unlike an indictment, may be amended by leave of court, even after motion to quash, demurrer, or plea (22 Cyc. p. 436, and cases cited); for, as Lord Mansfield observes, in Rex v. Wilkes, 4 Burr. 3567:

"'There is a great difference between amending indictments and amending informations. Indictments are found upon the oath of a jury, and ought only to be amended by themselves; but informations are as declarations in the king's suit. An officer of the crown has the right of framing them originally, and may, with leave, amend in like manner as any plaintiff may do.'" See also Coates v. United States, 4 Cir., 290 F. 134, 135.

Rule 7(e) of the Rules of Criminal Procedure, 18 U.S.C.A. following section 687, provides: *"Amendment of Information.* The court may permit an information to be amended at any time before verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced."

The Rules of Criminal Procedure went into effect on March 21, 1946, after the trial in the instant case was had. In its Notes to Rules of Criminal Procedure, 4 F.R.D. 405, 412, however, the Advisory Committee on Rules of Criminal Procedure observed, citing the Muncy case, supra: "Note to Subdivision (e) [of Rule 7]. *This rule continues the existing law that,* unlike an indictment, an information may be amended."

A careful study of the entire record has convinced us that the substantial rights of the appellants were not prejudiced by the amendment in question, and that the court below did not abuse its discretion in permitting it.

7. *"The court's statements to the jury, both during the trial and in the course of the instructions, were highly prejudicial".*

One of the "statements" objected to by the appellants was the opinion expressed by the court below that the Government perhaps might have brought in "a conspiracy count against these people so if they were convicted the court could send them to the penitentiary." In presenting this objection to this Court, however, the appellants failed to point out that the court made the observation "without the hearing of the jury".

We will not burden an already over-long opinion with setting forth in extenso the remarks of the judge below that it is contended were prejudicial to the appellants. Suffice it to say that they were

made in connection with rulings on the evidence, and were part of the familiar give-and-take of a criminal trial. It is elementary that a Federal judge has the right to comment on the evidence, and that it is not only his right but his duty to admonish counsel when necessary, provided he does so in temperate language. At no time did the court below prejudicially overstep the proprieties in the instant case.

Appropriate in this connection are the observations of Mr. Justice Harlan in Rucker v. Wheeler, 127 U.S. 85, 93, 8 S.Ct. 1142, 1146, 32 L.Ed. 102:

"It is insisted by the plaintiff that the court went too far in its expressions of opinion upon the evidence bearing upon this issue, and that what was said had practically the effect of taking the case from the jury. It is no longer an open question that a judge of a court of the United States, in submitting a case to the jury, may, in his discretion, express his opinion upon the facts; and that 'when no rule of law is incorrectly stated, and all matters of fact are ultimately submitted to the determination of the jury,' such expressions of opinion are not reviewable on writ of error. [Cases cited]"

Similarly apposite is the language used in Goldstein v. United States, 8 Cir., 63 F.2d 609, 613: "It is not always possible during the trial of a hotly contested case for a judge, however impartial he may be, to maintain in the courtroom that atmosphere of complete judicial calm which is so much to be desired. We must not overlook the fact that the human element cannot be entirely eliminated from the trial of lawsuits. While counsel owe to the court, because of the position which he occupies, the utmost deference and respect, and while the court owes to them an equal obligation of courtesy and patience and consideration, nevertheless sharp differences of opinion do arise in the heat of trial and things are said which were better left unsaid. Such incidents are often regarded as trivial during the trial of a case and are quickly lost sight of, but, when set forth in the record and emphasized by counsel on appeal, they take on an importance which they never actually possessed. It is impossible to gather from the cold record, particularly when it is in narrative form, the atmosphere of the trial itself, the manner in which the words were spoken, or the probable effect, if any, which they had upon the merits of the controversy. Critical remarks of the court frequently cut both ways, if they cut at all. Colloquies between counsel and colloquies between the court and counsel as to the rules of evidence are not ordinarily regarded by a jury as serious matters or of much concern to them. An appellate court should be slow to reverse a case for the alleged misconduct of the trial court, unless it appears that the conduct complained of was intended or calculated to disparage the defendant in the eyes of the jury and to prevent the jury from exercising an impartial judgment upon the merits." See also Ford v. United States, 9 Cir., 10 F.2d 339, 347, affirmed, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793; United States v. Bob, 2 Cir., 106 F.2d 37, 40, 41, certiorari denied, 308 U.S. 589, 60 S.Ct. 115, 84 L.Ed. 493; United States v. Warren, 2 Cir., 120 F.2d 211, 212; United States v. Goldstein, 2 Cir., 120 F.2d 485, 491.

8. *"The court erred in its instructions to the jury."*

The only instruction to which exception was taken by the appellants in the court below and which is now being pressed before us, was the following: "While I have not commented on the evidence, there is just one question before the jury as I said, a question of fact—the approximately 260,000 points, did they come from an unlawful acquisition or did they receive them in accordance with, you might say, the testimony of the defendants, or was there an unlawful acquisition?"

The appellants maintain that this instruction "in view of the evidence, prejudiced the jury in that the Government had totally failed to prove that the defendants or either of them had anything to do with the bank deposits, but on the contrary had proven affirmatively that neither of them had anything to do with the bank deposits."

As we have heretofore endeavored to show, the presence of a "terrific" number of counterfeit ration stamps in the bank deposits of the Hollywood Ranch Market,

owned and controlled by the appellants, taken in connection with the testimony of Jones and Becker that the appellants purchased those stamps, was a circumstance that could be taken into consideration by the jury. There was no error in the instruction of which the appellants complain.

The appellants in their main brief urge several objections to the court's instructions, although no exceptions to such instructions were saved in the court below. Furthermore, in their reply brief, they object to several additional instructions, as to which they admit that no exceptions were taken. They insist, however, that this court should on its "own motion notice instructions which are so erroneous as to constitute a denial of justice".

■ In our view, the court gave no instructions, whether excepted to or not, that were "so erroneous" as to afford grounds for reversal. While in some instances the court, in an endeavor to meet counsel's captious criticisms, restated with less clarity certain propositions of law that had previously been unexceptionably expounded, we believe that the jury understood the court's meaning and were in no way misled by any imperfections of phraseology.

■ It has long been the settled rule in Federal courts that an instruction by the court must be excepted to before the case is submitted to the jury in order to be availed of on appeal. This is no merely technical requirement, but is founded upon reason, justice and expediency. If the error is seasonably called to the court's attention, the court can correct it forthwith and thus obviate the necessity of a new trial. Tucker v. United States, 151 U.S. 164, 170, 14 S.Ct. 299, 38 L.Ed. 112; St. Clair v. United States, 154 U.S. 134, 153, 14 S.Ct. 1002, 38 L.Ed. 936; Lindsay v. Burgess, 156 U.S. 208, 210, 15 S.Ct. 355, 39 L.Ed. 399; Howland v. Beck, 9 Cir., 56 F.2d 35, 37; Brevard Tannin Co. v. J. F. Mosser Co., 4 Cir., 288 F. 725, 730; Meadows v. United States, 4 Cir., 144 F.2d 751, 753.

We have carefully examined the judge's charge in its entirety, and have found in it no reversible error.

In this connection, it should be noted that more than one-half of the appellants' reply brief is taken up with a criticism of the court's instructions that were not referred to in its opening brief or in the appellee's brief. The pretext for this departure from the standards of good brief-writing is that "the appellee's contention that appellants have not sufficiently specified the erroneous instructions is without merit". Though no page reference to the appellee's brief is given, we assume that the appellants refer to the appellee's discussion of a *single* instruction dealing with the necessity of a transfer of food for the acquisition of ration stamps. That instruction in reality was part of the instruction already considered hereinabove, being given during a colloquy with counsel.

■ Such discussion by the appellee did not open the door to the criticisms of other instructions. New material does not belong in a reply brief. Its introduction violates the spirit if not the letter of our Rule 22, which provides that, in oral arguments, "a fair opening of the case shall be made by the party having the opening and closing argument". Certainly the use of new material in a reply brief transgresses against the canons of fair forensics.

9. *"The evidence is insufficient to sustain every material element of the offenses for which the appellants were convicted and therefore the verdict was contrary to law and the facts."*
10. *"The evidence is insufficient to justify the verdict of guilty against Nathan Gilbert on Counts Nine, Ten and Eleven, or on any of said counts."*
11. *"The evidence is insufficient to justify the verdict against William Fredrick on Counts Nine, Ten and Eleven, or on any of said counts."*

These three "factual" counts can be considered jointly—and briefly. We have already given a careful summary of all the salient evidence adduced by the appellee. We need not rehearse it again.

An examination of our summary will show that each of the appellants either personally committed acts that culminated in the purchase of stamps from Becker, or aided his partner in doing so. Many of

the stamps thus purchased were counterfeit. A large number of counterfeit stamps found their way into the appellants' bank deposits. There was enough evidence to go to the jury.

12. *"The court erred in denying appellants' motion to require the Government to elect which of the counts it would rely on at the outset of the trial."*

This objection is cognate to Specification No. 4, in which it is asserted that the court erred in permitting the same offense to be charged in more than one count. We have already fully discussed that entire question in connection with the latter specification.

13. *"The court erred in denying appellants' motion to set aside the verdict and for a new trial."*

The points urged in the motion that is the subject of this specification are substantially the same as those upon which the other thirteen specifications of error are predicated. Accordingly, it is not necessary for us to give this specification separate consideration.

14. *"The court erred in refusing to put the questions to the jury as asked for by appellants' counsel, said counsel to determine the prejudices of the jury."*

Counsel calls attention to the following excerpts from the record:

"Mr. Gottfried: Would your honor ask the members of the jury whether or not they would give the testimony of the defendants the same credence and weight they would give the testimony of a Government investigator or employee of the Government.

"The Court. Well, I will answer that request the same as I answered Mr. Binns' request. The jury is the sole judge of the weight of the testimony of the witnesses. The witnesses will appear before them and the jury can judge for themselves. That is their province."

In the first place, it is not only the jury's right but its duty, in weighing the testimony of a defendant, to consider his interest in the outcome of the case. In Reagan v. United States, 157 U.S. 301, 311, 15 S.Ct. 610, 613, 39 L.Ed. 709, the leading case on the subject, the court said: "Tested by these rules, we see in the instruction objected to nothing of which complaint can reasonably be made. In the first place it lays down a general rule applicable to all circumstances, and then, in the latter part, simply calls attention to the fact that the defendant has a deep personal interest in the result of the suit, and that that should be considered by the jury. There is no declaration nor intimation that the defendant has been untruthful in his testimony. There is only a reference to the jury of the matter of credibility coupled with the declaration that interest in the result is a circumstance to be weighed in its determination. This, clearly, is unobjectionable." See also Schulze v. United States, 9 Cir., 259 F. 189, 191, 192.

Therefore it clearly is not reversible error for a trial court, on the voir dire, to decline to ask members of the jury *in advance of the testimony* whether, in effect, they will ignore the fact that the defendant has an interest in the outcome of the trial, and will give his testimony "the same credence and weight they would give the testimony of a Government Investigator or employee of the Government", who may or may not have a comparable interest in an opposite outcome.

Furthermore, considerable discretion is lodged in the court as to the questions that are to be asked on voir dire. In Connors v. United States, 158 U.S. 408, 413, 15 S.Ct. 951, 953, 39 L.Ed. 1033, the court used the following language: "It is quite true, as suggested by the accused, that he was entitled to be tried by an impartial jury; that is, by jurors who had no bias or prejudice that would prevent them from returning a verdict according to the law and evidence. It is equally true that a suitable inquiry is permissible in order to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried. That inquiry is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion. This is

the rule in civil cases, and the same rule must be applied in criminal cases." See also Brady v. United States, 9 Cir., 26 F. 2d 400, 403, certiorari denied, 278 U.S. 621, 49 S.Ct. 24, 73 L.Ed. 542.

We do not believe that the court below abused its discretion in refusing to ask the jury the question requested by the appellants.

In an effort to spell out reversible error, the appellants have indulged in microscopic criticisms of the record below. Such tactics call to mind the language used in Glasser v. United States, 315 U.S. 60, 83, 62 S.Ct. 457, 470, 86 L.Ed. 680: "Perhaps the court did not attain at all times that thoroughgoing impartiality which is the ideal, but our examination of the record as a whole leads to the conclusion that the substantial rights of the petitioners were not affected. The trial was long and the incidents relied on by petitioners few. We must guard against the magnification on appeal of instances which were of little importance in their setting. [Cases cited]"

Again, in United States v. Breen, 2 Cir., 96 F.2d 782, 784, certiorari denied, 304 U.S. 585, 58 S.Ct. 1061, 82 L.Ed. 1546, it was said: "All too often, it seems, appellants like these become overcritical of a trial judge after conviction and on appeal seek to try him instead of the merits or demerits of their cause." See also Garland v. State of Washington, 232 U.S. 642, 646, 34 S.Ct. 456, 58 L.Ed. 772; Garber v. United States, 6 Cir., 145 F.2d 966, 974.

We have carefully examined the entire record, and find no reversible error. Accordingly, the judgments are affirmed.