## TAKAHASHI et al. v. UNITED STATES.
### No. 10415.

Circuit Court of Appeals, Ninth Circuit.

May 31, 1944.

Samuel B. Bassett, of Seattle, Wash., for appellant Takahashi.

Tracy E. Griffin, of Seattle, Wash., for appellant Osawa.

J. Charles Dennis, U. S. Atty., and G. D. Hile and Allan Pomeroy, Asst. U. S. Attys., all of Seattle, Wash., for appellee.

Before STEPHENS and HEALY, Circuit Judges, and FEE, District Judge.

JAMES ALGER FEE, District Judge.

The appellants were indicted and convicted on one count, of violation of the conspiracy statute[1] and on a second count, of the violation of an executive order by designating China as the country of destination on an application for license to export certain new storage tanks when in fact Japan was the country of ultimate destination[2] and finally on a third count, of causing false and fraudulent statements to be made in that application in a matter within the jurisdiction of the Department of State.[3]

Appellants are American citizens, born in the United States of Japanese ancestry and each has lived in Seattle all his life. The appellants have known each other since childhood. In 1920, Takahashi succeeded his father in the exporting and importing business to and from the Orient. His business was prosecuted generally under the firm name of "Charles T. Takahashi & Co." Since 1929, Osawa was employed by Takahashi and finally became general manager of the company. Since that time, Takahashi has also used the name "China Import & Export Company." Although, before the war, Takahashi did a considerable business of general importing and exporting with branch offices in Portland, Oakland, Vancouver and Tokyo, by 1940 this was considerably disrupted. However, he still did quite a volume of business in exportation to Japan of large second-hand oil tanks for the storage of oil to a recognized financial concern in Tokyo called Mikuni-Shoko Limited. Beginning in the year 1940, Mikuni-Shoko had ordered about forty of these tanks for delivery in Japan. Most of these had been forwarded when the United States government, in August 1940, prevented the export, without special license, of steel scrap to Japan. Since Takahashi had several of these tanks on hand, it became important to know whether these used tanks were scrap steel within the prohibition. Upon application, authorities in Washington ruled that there was no li-

cense required. Mikuni-Shoko then placed an order for eleven new tanks for delivery in Japan, but only three were obtainable and while these three were not yet completely manufactured, by presidential order, ten days were allowed for the export of outstanding orders with the warning that after that time exportation could only be made under special license.

An attempt was made by Takahashi to construct some formula which would be approved by the government so that the tanks could go forward and while these negotiations were pending, Takahashi sent Osawa to Tokyo. According to their stories, Osawa was to settle a disputed claim in North China, close the Tokyo office of the concern and then make commercial arrangements for the importation of China wood oil at Shanghai. According to appellants, Osawa arrived in Tokyo, settled the account in North China, paid the Mikuni-Shoko Company the money that had been received on the tanks and closed the Tokyo office. Osawa testifies that owing to the control of Shanghai by the Japanese, he did not go there but asked Mikuni-Shoko Company for assistance in getting representation in Shanghai and the Mikuni-Shoko Company finally cabled that they had decided that the name of the firm was Hua Hsin Company in Shanghai. It was then said that Osawa suggested to Mikuni-Shoko Company, that an offer of these tanks should be made to Hua Hsin Company as a starter for the business connection. About July 16, Takahashi received from Hua Hsin Company, by cablegram directed to China Import & Export Company, an order for the purchase of these same three tanks and thereupon he made and filed in Washington, D. C., an application for permission to forward them to this company at Shanghai which was not forbidden by regulation although delivery in Japan would have been. No cash nor any supporting credit ever came from Hua Hsin Company or elsewhere. Takahashi finally sold the tanks to other customers.

When Osawa had closed the Tokyo office and had adjusted the Takahashi business, he was unable to leave Japan in July because of the existing situation, but finally he got a ship which took him to Seattle arriving November 2. From Victoria he

[1] 18 U.S.C.A. § 88.

[2] Section 6 of the Executive Order, No. 8712, approved by the President March 15, 1941, effective April 15, 1941, promulgated pursuant to 50 U.S.C.A. Appendix, § 701.

[3] 18 U.S.C.A. § 80.

wired Takahashi to meet him in Seattle with some money for customs duties, which Takahashi did. Before leaving the boat Osawa dropped a letter in the waste paper basket in his stateroom which letter indicated that he was going to smuggle six pairs of silk stockings into the country. The finding of this letter probably led to some of the subsequent events. The customs officers had had Takahashi under observation for a considerable time suspecting a violation of the Foreign Funds Control Act, 50 U.S.C.A.Appendix, § 5, and this was another contributing factor to the subsequent events. Takahashi had a permit to go upon an incoming vessel but was not to enter the enclosure for the customs where the baggage is examined. Takahashi went aboard the boat and then subsequently into the customs enclosure where he and Osawa were conversing. Eventually they passed some papers from one to the other. The customs officers then acted and searched the brief case of Takahashi wherein they found a great many letters and documents. They also examined the brief case of Osawa and found one letter which was not of great importance.

There is no point in setting out in full, or even in part, the documents which were seized by the customs officers in this case. It suffices to say that they did not constitute an agreement to violate any law or executive order issued under the authority of the United States. But these code telegrams, letters and other documents did indicate and were evidence that the appellants knew that the ultimate destination of the three tanks was not Shanghai; that the Hua Hsin Company was a fictitious entity; and that the real purpose of appellants was to deliver these tanks to the agents of the Japanese military authorities (called Gunbu in the documents). It also appeared therein, inferentially or by direct statement, that Osawa's mission was in fact to Tokyo to return the money paid for the tanks to its source and thereupon he was hounded day by day by the military authorities in Japan to get delivery of the three tanks by Mexico or Vladivostok. This ended finally in the suggestion of a name of a Hua Hsin Company of which Osawa had never heard before, in the effort to have the tanks put aboard a ship for Shanghai so that they could be taken off at Yokohama. It also appeared that reliance was still placed on the $71,700 which had originally been advanced by Mikuni-

Shoko Company and on no other credit or money whatsoever.

On April 27, 1942, six months after the search, but before trial, appellants filed a joint petition asking for the suppression of this evidence. This petition was refused and the case went on trial. The errors assigned relate to the denial of the petition for the return of the papers and their introduction in evidence; the denial of the motions to dismiss the indictment and for a directed verdict; the comment of the court to the jury; and the instruction which the court gave regarding good reputation.

The exception as to the instructions on reputation will first be dealt with. Neither is technically entirely exact, but appellants did not point out specifically wherein the inexactness lay so that the trial court could have made a correction and therefore error, if any, was waived. Furthermore, the impression created by these instructions was not unfair to appellants and on the whole did no harm.

The portion of the instructions to which exception was taken as unfair comment, was a summary of the evidence and a construction of the written documents which were involved in the seizure. The competent trial judge posed certain questions with reference to these documents which plainly suggested his opinion that the jury might arrive at certain conclusions after a consideration of the evidence. However, he constantly reiterated the instruction that the jury was not bound by the comment by the judge upon a question of fact and the axiom that the jury are the sole and exclusive judges of the fact. He likewise gave the appellants the benefit of comment favorable to them on other features and wove the whole into a pattern which plainly gave the jury to understand that the appellants were not to be convicted unless the government proved the material allegations of the indictment beyond a reasonable doubt. In this case the trial judge did nothing more than was done in United States v. Goldstein, 2 Cir., 120 F.2d 485, 491:

"He then put before them a number of questions whose answers they might, he thought, find important or even critical in deciding the guilt or innocence of the accused. These he did indeed couch in such a way as to make fairly apparent what answers he would himself have given to

them; and it must be owned that the answers were damaging."

It was there held that the comment and method of commenting were not improper.

■ In the net result, we believe that the comment was not improper and that a correct result was reached by the jury under the instructions of the court. This brings us to the next point which is that there is no proof of criminal intent. Here again, unless the court can say affirmatively that no circumstances were proven which might justify a finding of specific intent, the question was one of fact to be resolved by the jury. Questions of knowledge and intent are always questions of fact for the jury. Even though a judge would not have drawn the particular inference, he is not required to set aside a verdict if the jury could find that such an intent existed beyond a reasonable doubt. Although, nowhere, in the letters or otherwise, is it expressly stated that the tanks were destined for Japan, and although it might have been the intention that they go to India or the Philippines, the jury was justified, under the evidence, in finding that the military authorities intended to take these tanks off at Yokohama when the ship touched there. Once the documents which were seized were admitted in evidence, there was sufficient proof upon which the jury in this case could find that the defendants were guilty of the crimes charged.

These determinations make cardinal the question of whether the use of the seized documents in evidence was a violation of the basic rights of appellants.

In accordance with the formula prescribed by the federal courts, motions to suppress documents taken from the persons of appellants were made before trial and overruled. The government contends (1) that the seizure may have been in some parts lawful to one of the appellants and therefore was not available to both; (2) that the right was waived because the motion was not timely made and because Takahashi delivered other papers to agents of the government.

■ Where two defendants were found together exchanging papers and each was searched and papers found upon the search were seized and offered at the trial of the two jointly for the same crimes, a defense of unlawful seizure and admission valid for one defendant must equally extend to the other. See United States v. Thomson, 113 F.2d 643, 129 A.L.R 1291. If the situation were called to the attention of a trial judge before trial, it would be an abuse of discretion to refuse severance. The ground of this doctrine is that the defendant so jointly indicted has unquestionably been prejudiced by the connection of the other defendant with the evidence, trial and conviction. Especially is this true when dealing with a conspiracy indictment. In this instance, the possession of the documents by appellants was joint and the search was practically a joint operation. The realities must here control and both judgments of conviction stand or fall together.

■ It is next objected that the motion for suppression of the evidence was not timely made because the original seizure was made November 2 at the dock while the motions were not filed until April 27, 1942. However, it is hornbook law, so far as suppression of the evidence at a trial is concerned, that even the strict rule of the federal courts requires only that the motions be made in advance of trial so that the judge will not have to rule thereon while the jury is waiting. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, L.R.A.1915B, 834, Ann.Cas.1915C, 1177.

■ It is also contended that Takahashi has waived his right to object to the use of this evidence because he discussed it with the agents of the government while they were in possession of the documents and furthermore, at their request, he gave to them other documents for inspection. But, if it be established that there was an unlawful seizure of these documents, all declarations and statements under the compulsion of the things so seized, are affected by the vice of primary illegality. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 391, 40 S.Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1426. If it were not so, a defendant would be required to give evidence against himself in violation of the amendment because a prior illegal act had been committed by the agents of the United States.

■ It is obvious then, that these American-born Japanese, engaged in what all will admit was a shady commercial transaction in which the military government of Japan might have profited, could, with ill grace, refuse the United States any evidence in their possession. Reluctance upon their part would probably be interpreted as evidence of treason or at least trading

with the enemy. Obviously also, it is only because evidence of more serious crimes is unavailable, if it exists, that prosecution is brought on this charge. Under such circumstances, there was no waiver of the guarantee of the Fourth Amendment.

■ Approaching the main point, the government contends that the search was legal. Counsel for defense so conceded. Treasury regulations permit search at ports of debarkation for contraband articles smuggled into the country. Authority for such a search is given by Title 19 U.S.C.A. § 482. Such a search was upheld in Landau v. United States Attorney, 2 Cir., 82 F.2d 285. In this case there was reasonable ground, under these authorities, to search Osawa because his discarded letter indicated an intention to violate the customs ,laws. There was also reasonable ground to search Takahashi because he was improperly in the customs compound and was conversing with and exchanging articles with Osawa. It might, therefore, have reasonably been believed that he was assisting in a smuggling operation.

But the authority to search cannot be .confused with the authority to seize. It cannot be confused with the power to use seized articles in evidence. The Fourth Amendment prohibits unreasonable searches and seizures. The distinction has never been more carefully drawn than in the language used by Mr. Justice Miller in the concurring opinion in the case of Boyd v. United States, 116 U.S. 616, 641, 6 S.Ct. 524, 538, 29 L.Ed. 746. It is there said:

"The searches meant by the constitution were such as led to seizure when the search was successful"

And again: "The things here forbidden are two: search and seizure."

This concurring opinion, although it discovered no search and no seizure in that particular case, held that an order requiring a person involuntarily to produce his private papers in court, was "within the protection which the constitution intended against compelling a person to be a witness against himself * * *." In the main opinion in this cited case, the syncretism of the doctrines of the Fourth and Fifth Amendments which give protection against the use of private papers in evidence is clearly developed. Boyd v. United States,

116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746.

The situation must now be analyzed to discover whether there was any unreasonable seizure of private papers of appellants and also to discover whether there was any compulsion used to require either of appellants to testify against himself by the use of such papers.

Two situations must now be distinguished. In the first place, this was not a search as an incident to a legal arrest for the commission of crime. See Carroll v. United States, 267 U.S. 132, 158, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790. As a matter of fact, the authorities at the time of the search had no power to make an arrest because they did not have a warrant of arrest and because no crime had been committed in their presence. Nor had a felony been committed, to their knowledge, so that they had the power to arrest a person reasonably suspected of the commission thereof. Indeed there is no evidence that any crime was committed except those charged in the indictment and the officers were entirely ignorant of those. In the second place, there was not here a properly issued search warrant describing particular articles to be seized.

■ It may be laid down as a general principle that a reasonable seizure can only be made of instrumentalities of the crime itself and not of private papers which are mere evidence or indicia of the commission of a crime.

■ It is argued that the papers in this case are not mere evidence, but are themselves the instrumentalities of crime. The Executive Order under which Count Two of the indictment is brought speaks of "the application for license" and the "consignment".[4] Unquestionably, under this provision the application for the license itself would be an instrumentality for commission of the crime. Likewise, it is probable that it would be held that the actual consignment for trans-shipment from one country to another might well be, but the tanks themselves are not declared to be illegal property by the regulation and the letters and other papers taken from the persons of the defendants are likewise mere evidences of the intention upon the part of the defendants to commit a crime.

Count three of the indictment is based upon the same Executive Order in connec-

[4] Paragraph 6, Executive Order, approved by the President, March 15, 1941, effective April 15, 1941. Issued pursuant to Title 50 U.S.C.A.Appendix, § 701.

tion with Title 18 U.S.C.A. § 80 which forbids the making of false, fraudulent or fictitious statements and representations concerning a matter within the jurisdiction of a department or agency of the United States knowing them to be false, for the purpose of influencing the action of such department or agency. The indictment again is based upon the application for license to export articles and materials.

It is apparent in this instance also, that while the application for the license might be deemed to be an instrumentality of the crime, that the papers seized were only evidences of the intent upon the part of the defendants to trans-ship these goods.

 Count One of the indictment was based upon Title 18 U.S.C.A. § 88, and alleged a conspiracy to violate paragraph six of the Executive Order above cited. Among the overt acts described as incidents of the conspiracy were the writing of a good number of the seized letters, but it is a plain principle that the gist of a charge of conspiracy is the making of the illegal agreement, combination, confederacy or conspiracy and that the overt acts are simply steps along the route or movements in the direction of consummation. It is true that there can be no establishment of a conspiracy charge without proof that some movement or overt act has been made tending to consummate the illegal agreement. But, although their making or transmission were alleged as an overt act, no one of these papers itself was anything more than evidence. It is probable that the only overt acts which would have been available as proof were the departure of Osawa from Seattle to Japan and the preparation of the application for license to export articles and materials. Certainly no others would have been necessary. The seized papers are not in themselves an agreement or contract to violate the regulation, but merely evidences of an illegal combination or a conspiracy to violate it.

The distinction must be drawn between papers which are a part of the outfit or equipment actually used to commit an offense such as the ledgers and bills used to maintain a nuisance exemplified by the situation developed in Marron v. United States, 275 U.S. 192, 199, 48 S.Ct. 74, 72 L.Ed. 231, and those papers which are simply evidences of intent, design or even of the agreement of the defendants.

In United States v. Lefkowitz, 285 U.S. 452, 465, 466, 52 S.Ct. 420, 423, 76 L.Ed. 877, 82. A.L.R. 775, the Marron case above cited is distinguished. The court say:

"Though intended to be used to solicit orders for liquor in violation of the act, the papers and other articles found and taken were in themselves unoffending. The decisions of this court distinguish searches of one's house, office, papers or effects merely to get evidence to convict him of crime from searches such as those made to find stolen goods for return to the owner, to take property that has been forfeited to the government, to discover property concealed to avoid payment of duties for which it is liable, and from searches such as those made for the seizure of counterfeit coins, burglars' tools, gambling paraphernalia, and illicit liquor in order to prevent the commission of crime."

Thus, it appears plain that a valid search warrant could not be issued for the purpose of seizing these papers even if after the search the government had proceeded in that manner.

 It may be laid down as a principle that where a search is justifiable and legal for the purposes of obtaining the instrumentalities of the commission of a particular crime, the seizure of evidence that an entirely different crime may have been committed is not justified by the circumscribed authority for the legal search. Otherwise, a general seizure of documents could be carried out where a valid search warrant could only be issued for limited objectives. Applying this principle to the instant case, it may be said that although the officers had the right to search Osawa and Takahashi, for contraband goods which the appellants were attempting to smuggle into the country, this would give them no right to seize or attempt to use in evidence private papers even if these, when introduced in evidence, proved that the crime of falsification of an application for a license or conspiracy to falsify it, had been made beyond peradventure of doubt.

 Finally, if we lay aside the proposition that the seizure was illegal, still the government would not have the right to introduce these papers into evidence. They belonged to Takahashi and Osawa and had not been taken from them by any legal means. The agents of the United States had no right to the possession thereof. The appellants were objecting to the use thereof in evidence. When, therefore, they were introduced over the objection of the appellants, each of appellants was com-

pelled to testify against himself. In Gouled v. United States, 255 U.S. 298, 306, 41 S.Ct. 261, 264, 65 L.Ed. 647, the court say:

"In practice the result is the same to one accused of crime, whether he be obliged to supply evidence against himself or whether such evidence be obtained by an illegal search of his premises and seizure of his private papers. In either case he is the unwilling source of the evidence, and the Fifth Amendment forbids that he shall be compelled to be a witness against himself in a criminal case."

If the United States could not introduce in evidence copies of documents evidentiary in effect, the originals of which had been improperly taken in the first instance as in the Silverthorne case, or like documents which were obtained "by stealth, or through social acquaintance, or in the guise of a business call" as in the Gouled case, it cannot be held that like documents seized during a search for contraband can be introduced as proof of an utterly different charge of crime.

It must be concluded then, that the motions to suppress on the part of the appellants should have been granted. For the failure to grant the motions, thus permitting the documents to be introduced in evidence, the judgments must be set aside and the cause remanded for further proceedings in accordance herewith, including new trial if the government be so advised.