## UNITED STATES v. ON LEE.

### No. 54, Docket 22098.

United States Court of Appeals
Second Circuit.

Argued Oct. 3, 1951.

Decided Nov. 21, 1951.

Writ of Certiorari Granted March 3, 1952.
See 72 S.Ct. 560.

Frank, J., dissented.

Gilbert S. Rosenthal, New York City, for appellant.

Myles J. Lane, U. S. Atty., New York City (Stanley D. Robinson and Robert Martin, Assts. U. S. Atty., New York City, of counsel), for appellee.

Before SWAN, Chief Judge, CLARK and FRANK, Circuit Judges.

SWAN, Chief Judge.

This appeal brings up for review a judgment of conviction and sentence under a two count indictment. Count one charged the substantive offense of selling one pound of opium in violation of 21 U.S.C.A. §§ 173 and 174. Count two charged a conspiracy, 18 U.S.C. § 371, to sell opium in violation of sections 2553(a) and 2554(a) of Title 26 as well as the above mentioned sections of Title 21. The appellant was sentenced to three years' imprisonment on each count, the terms to run concurrently, and to a fine of $500 on count one. The appeal chal-

lenges the sufficiency of the evidence, and asserts errors in the conduct of the trial and in the charge to the jury.

The indictment named two defendants, the appellant and Gong Len Ying. The latter pleaded guilty and testified for the government at the trial of the appellant. He testified that on January 22, 1950 he agreed to deliver to Benny Gim, an undercover agent of the Bureau of Narcotics, one pound of opium for $550; that Gim gave him the money which he turned over to the appellant, except $70 retained as his share, and that the appellant then got the opium and delivered it to him and he delivered it to Gim. The appellant took the stand in his own defense and denied having had anything to do with, or any knowledge of, the transaction. He admitted having been with Ying on the evening of January 22nd but said their meeting and conversation related only to the purchase of a laundry to whose owner Ying proposed to introduce him. Which story to believe was plainly for the jury. The appellant argues that even accepting Ying's testimony in full, it proved merely a sale by appellant to Ying (not the crime charged) and a sale by Ying on his own account to Gim.[1] But this interpretation of the transaction was foreclosed by the testimony of Agent Lee, if credited by the jury. Agent Lee testified that he heard the appellant admit in conversation with Chin Poy, a government informer, that the opium sold to Gim belonged to a syndicate of which the appellant was a representative and that he had employed Ying to make the sale. Without detailing more of the testimony, we think it obvious that the evidence as to both counts required submission of the case to the jury.

It is urged that error was committed in admitting Agent Lee's testimony concerning the above mentioned conversation between Chin Poy and the appellant. This conversation took place in appellant's laundry several weeks after his arrest and while he was enlarged on bail. Chin Poy carried a concealed radio transmitter and Agent Lee, who was outside the laundry, overheard the conversation by means of a

1. Cf. United States v. Koch, 2 Cir., 113 F.2d 982.

radio receiving device tuned to Chin Poy's transmitter. The testimony was received over the appellant's objection and it is now contended that disclosure of the overheard conversation is forbidden by the Federal Communications Act, 47 U.S.C.A. § 605.[2] The contention is not sustainable. As the Supreme Court said in Goldman v. United States, 316 U.S. 129, 133, 62 S.Ct. 993, 995, 86 L.Ed. 1322: "The protection intended and afforded by the statute is of the means of communication and not of the secrecy of the conversation." There was no "interception" of a communication by wire or radio which is what the statute forbids. The radio device was merely a mechanical means of eavesdropping, just as the detectaphone was in the Goldman case.[3]

As a second string to his bow the appellant contends that even if the use of the radio transmitter by Chin Poy and Agent Lee did not violate section 605, the evidence was inadmissible because it was obtained by a trespass and constituted an unreasonable search and seizure in violation of the Fourth and Fifth Amendments.[4]

▆▆ In Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647, a federal employee entered the office of one suspected of crime under the pretext of paying a friendly visit and while there surreptitiously extracted certain papers. This was held to be an unreasonable search and seizure within the meaning of the Fourth Amendment,

and the admission of the papers in evidence was held a violation of the Fifth Amendment. In commenting upon the Gouled case in Olmstead v. United States, 277 U.S. 438, 463–464, 48 S.Ct. 564, 567, 72 L.Ed. 944, Chief Justice Taft remarked:

"Gouled v. United States carried the inhibition against unreasonable searches and seizures to the extreme limit. Its authority is not to be enlarged by implication, and must be confined to the precise state of facts disclosed by the record * * * There was actual entrance into the private quarters of defendant and the taking away of something tangible. Here we have testimony only of voluntary conversations secretly overheard.

"The amendment itself shows that the search is to be of material things—the person, the house, his papers, or his effects. The description of the warrant necessary to make the proceeding lawful is that it must specify the place to be searched and the person or *things* to be seized." (Emphasis in original.)

In the last decade the Supreme Court has expanded the protection of the private citizen against unreasonable interference with his home, his person or his effects, but none of these decisions has directly questioned Chief Justice Taft's analysis. *Dicta*, however, in Goldman v. United States, 316 U.S. 129, 134, 62 S.Ct. 993, 86 L.Ed. 1322, indicate that where officers, by a trespass, en-

---

2. This section provides that "no person not being authorized by the sender shall intercept any communication and divulge or publish" the contents of such intercepted message.

3. See Judge L. Hand's comment thereon in Reitmeister v. Reitmeister, 2 Cir., 162 F.2d 691, 694.

4. Appellant cites the dicta of the Supreme Court and this court in the Goldman case to support his position. In the Goldman case agents had entered the defendant's office and installed a listening device near his telephone. This device failed to work, however. In its place the agents used a detectaphone in an adjoining room which was placed against the walls of defendant's room. The Supreme Court said: "We hold that what was heard by the use of the

detectaphone was not made illegal by trespass or unlawful entry.

"* * * Whatever trespass was committed was connected with the installation of the listening apparatus. As respects it, the trespass might be said to be continuing and, if the apparatus had been used it might, with reason, be claimed that the continuing trespass was the concomitant of its use." 316 U.S. 129, 134, 62 S.Ct. 993, 996.

This court had said: "Conspirators who discuss their unlawful schemes must take the risk of being overheard and the risk of having what is overheard used against them provided there is otherwise no trespass by the listener or violation of a statutory right to use a means of communication thus made immune from interception." United States v. Goldman, 2 Cir., 118 F.2d 310, 314.

tered the accused's office, attached a listening device to his phone and used it successfully, evidence so obtained might be inadmissible because obtained in violation of the Fourth Amendment. One Court of Appeals has expressly gone beyond the holding of the Olmstead case. In Nueslein v. District of Columbia, 73 App.D.C. 85, 115 F.2d 690, police officers entered a suspect's home while conducting an investigation of an automobile accident. When the homeowner appeared he admitted driving the car in question. The police were convinced by his appearance that he was intoxicated and they arrested him on a charge of drunken driving. Because the testimony of the police officers was admitted, the conviction of the accused was reversed. The opinion states, 115 F.2d at page 692: "The crucial thing 'found' in this 'search' was a declaration of fact by the defendant that has become decidedly incriminating." [5] But we are not disposed to follow the extension adopted by the court in the Nueslein case in view of the clear statement in the Olmstead case that only the taking of tangible things violates the Fourth Amendment. And this is especially so when we are confronted with the facts in the case at bar. If Agent Lee's testimony is to be excluded it would logically follow, in our opinion, that Chin Poy himself would not be allowed to testify as to the appellant's admissions. No case has been cited to us, and our own researches have found none, which would exclude, because of the Fourth Amendment, testimony of a government agent merely because he concealed from the suspect, when calling at his place of business,

that he was such an agent and intended if possible to extract damaging statements from the suspect. Nor do we think that the Gouled case can be cited for the proposition that entry by a government agent under such circumstances invariably constitutes a trespass which would render evidence thereby obtained inadmissible. The crucial fact in the Gouled case, as Chief Justice Taft pointed out, was that there was both an entry by subterfuge and a taking of a tangible thing. It will be noted that in the Goldman and Nueslein cases which indicate that the taking of an intangible thing may violate the Fourth Amendment, there was no entry by subterfuge. We do not think the Fourth Amendment stretches so far as to prevent the admission of statements heard by a federal employee in the accused's home or place of business whose only "trespass" is the fact that he conceals his true identity to gain information. It has long been customary for law enforcement agencies to obtain admissible evidence by this method of subterfuge,[6] and until otherwise instructed by the Supreme Court, we shall not interpret the Amendment to require the exclusion of statements so obtained.[7]

■ In the conversation overheard by Agent Lee on March 30, 1950 the appellant told Chin Poy that the syndicate of which the appellant was the representative could supply opium in the future. The court at once told the jury to disregard this evidence. Shortly thereafter the testimony was repeated and counsel then moved for a mistrial. Apparently the court never ruled directly on this motion and counsel did not

---

5. See Professor Morgan's comments on illegally obtained evidence, "The Law of Evidence, 1941–1945," 59 Harv.L.Rev. 481, 535–41 (1946).

6. "Our general experience shows that much evidence has always been receivable, although not obtained by conformity to the highest ethics. The history of criminal trials shows numerous cases of prosecutions of oathbound conspiracies for murder, robbery, and other crimes, where officers of the law have disguised themselves and joined the organizations, taken the oaths, and given themselves every appearance of active members engaged in the promotion of crime for

the purpose of securing evidence. Evidence secured by such means has always been received." Chief Justice Taft in Olmstead v. United States, 277 U.S. 438, 468, 48 S.Ct. 564, 569, 72 L.Ed. 944. See also Blanchard v. United States, 5 Cir., 40 F.2d 904, certiorari denied 282 U.S. 865, 51 S.Ct. 40, 75 L.Ed. 765; United States v. Wainer, D.C.Pa., 49 F.2d 789.

7. In two recent Supreme Court decisions evidence so gathered appears to have been admitted: Davis v. United States, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453; Trupiano v. United States, 334 U. S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663.

press for a ruling. The prosecutor claims that the testimony was competent because the conspiracy was charged as continuing down, to the date of the filing of the indictment, April 26, 1950; hence the statement made to Chin Poy, although made after the appellant's arrest, was made during the period covered by the indictment and was evidence of the crime charged. Whether this theory would justify admission of the testimony we need not say. Even assuming the evidence was incompetent, we think the court's instruction to disregard it cured the error.

It is strenuously argued that prejudicial error was committed by admitting into evidence testimony that the appellant remained silent when an accusatory statement was made by Ying in the appellant's presence after their arrest. Detective Monahan testified that he first asked the appellant if he had sold the opium or delivered it to Ying and the appellant denied that he had anything to do with it. The detective then asked Ying where he got the opium and Ying replied he got it from the appellant in the hallway of 79 Mott Street on the afternoon of January 22nd; the appellant said nothing. His counsel requested the judge to inform the jury that they should disregard the detective's conversation with Ying. No immediate ruling was made upon this request but a lengthy colloquy was had by court and counsel in the presence of the jury as to whether the appellant's silence could be considered against him as a tacit admission. The court reserved decision and asked counsel to submit authorities. Further discussion between court and counsel occurred later in the trial and at the conclusion of the prosecutor's case counsel for the appellant moved for a mistrial because of the admission of the evidence and the court's comments as to the inference to be drawn from the appellant's silence when the accusatory statement was

made. This motion was formally denied. But in charging the jury the court stated that no admission by Ying after his arrest could bind the appellant. After stating the general rule as to silence in the face of an accusatory statement, he said that the appellant having denied the charge once did not have to deny it again. "He has denied it once and that would be sufficient."

In the light of this court's decision in United States v. Lo Biondo, 2 Cir., 135 F.2d 130, 131, the admission of evidence as to appellant's silence when faced with Ying's accusation was erroneous, but in that case the jury was told that the accused's silence was a "circumstance which they may consider." In the case at bar the jury was told emphatically that having already denied that he gave the opium to Ying he was not obliged to deny it again when Ying made the charge in his presence. We think this cured any prejudice which might have resulted from the original admission of the evidence.[8] Colloquies as to rules of evidence are not ordinarily regarded by juries as of much concern to them.[9] Any unfavorable impression the jury may have received from the court's remarks during the colloquies, we regard as swept away by the charge.[10] The jury system is premised on the assumption that when the judge instructs the jury what evidence it may consider it will obey the instruction. In exceptional circumstances the prejudice from improperly admitted evidence may be too serious to be cured by a charge to disregard it.[11] But we do not regard the present as such a case.

Error is asserted in the court's refusal to give 16 of the defendant's 37 requests to charge. The appellant's main brief merely enumerates the 16 requests but does not point out wherein the charge as given was defective in respect to matters covered by the refused requests. This is not an adequate way to present an attack upon the

8. United States v. Chiarella, 2 Cir., 184 F.2d 903, 910, reversed on other grounds, 341 U.S. 946, 71 S.Ct. 1004, 95 L.Ed. 1370.

9. Fredrick v. United States, 9 Cir., 163 F.2d 536, 548, certiorari denied 332 U.S. 775, 68 S.Ct. 87, 92 L.Ed. 360.

10. United States v. Angelo, 3 Cir., 153 F.2d 247, 252; see also United States v. Aaron, 2 Cir., 190 F.2d 144, 146.

11. See Mora v. United States, 5 Cir., 190 F.2d 749, 752; Seaboard Air Line R. Co. v. Bailey, 5 Cir., 190 F.2d 812, 815.

charge. We have, however, examined the 16 enumerated requests and compared them with the charge as given. It will suffice to say that we perceive no substantial error in refusal of the requests.

Judgment affirmed.

FRANK, Circuit Judge (dissenting).

1. Sixty-five years ago, the case of a humble Chinese laundryman led to a decision involving the formulation of one of the most important constitutional principles.[12] Today On Lee's case, as I see it, presents the violation of one of the most cherished constitutional rights, one which contributes substantially to the distinctive flavor of our democracy. This appears from the following facts:

Chin Poy, a paid informer of the Narcotic Bureau, and himself a former drug addict, paid two "friendly" visits to On Lee's four-room combined laundry and dwelling. During these visits, the two men were alone most of the time. Unknown to On Lee, Chin Poy carried, concealed inside his pocket, a 3-inch microphone which picked up everything the two men said, and transmitted it to a receiving set manned by a narcotic agent, three or four doors down the block. This government agent, almost a year later, testified at the trial to what he had thus heard. The two visits, made for the sole purpose of gathering evidence against On Lee to be used in that trial, took place after On Lee's arrest while he was at large on bail.

On Lee was convicted primarily on that agent's testimony. The informer, Chin Poy, did not testify. But the agent testified that, by means of the concealed radio, he heard On Lee admit in one of the conversations that he had conspired with one Ying to sell opium, that On Lee represented a narcotics syndicate in the sale, and that he would make a future illegal sale to Chin Poy. Aside from this indirect testimony[13] of the conversation, the only evidence tying On Lee to the offenses was the testimony of Ying, the alleged co-conspirator, who turned "states evidence" at the trial. Government agents testified to various meetings between On Lee and Ying, but the agent with whom Ying negotiated the only illegal sale proved at the trial, had never heard On Lee's name mentioned; and no opium was found on On Lee or among his belongings. He consistently denied, after arrest and on the witness-stand, any connection with dope-peddling. His frequent meetings with Ying, On Lee explained by saying that he was discussing the possible purchase of a wet-wash laundry from a business friend of Ying's—a not implausible story. Except for the agent's testimony about On Lee's incriminating conversation with Chin Poy, the jury might well have believed On Lee and acquitted him. In the circumstances, then, a court must look critically at the damaging testimony of the narcotic agent to see if it warrants the conviction, for that testimony is the guts of the government's case.

The agent who, at a distance, heard the conversation by means of the hidden microphone (a method seemingly fantastic and smacking rather of lurid gangster movies or the comic strips than of American realities) was engaged, I think, in a search violative of the Fourth Amendment. My colleagues, in rejecting this conclusion, make two arguments. The first runs thus:

As nothing tangible was taken by any federal officer, no "seizure" occurred; therefore, even if there was an illegal entry on On Lee's premises, the Fourth Amendment was not violated.

That argument means this: A federal officer, without a warrant, unlawfully breaks into a man's house. While there he overhears the house-owner utter a voluntary statement of his own criminal conduct. The officer, according to my colleagues, has not violated the Fourth Amendment since he has seized nothing, for an oral statement is an intangible, i.e., as one cannot grasp sounds, one cannot seize them. Therefore, at the trial of the house-owner, the officer, over the defendant's objection, must be allowed to testify as to that oral statement.

But Chief Justice Vinson, when a circuit judge, speaking for the Court of Appeals,

12. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220.

13. How very indirect it was I shall show later.

decided precisely to the contrary in Nueslein v. District of Columbia, 73 App.D.C. 85, 115 F.2d 690, 692. There officers, entering unlawfully, overheard an incriminating oral statement. "The crucial thing 'found' in this 'search'" said the court, "was a declaration of fact by the defendant that has become decidedly incriminating. * * * The IVth and Vth Amendments relate to different issues, but cases can present facts which make the considerations behind these Amendments overlap. The officers violated the security of the defendant under the IVth by unlawfully coming into his home and by placing him in custody. * * * But how did the officers find themselves in position to see and hear the defendant? The officers, in the pursuance of a general investigation, entered the home under no color of right." And so the court ruled that the "officers' testimony regarding the defendant's declaration is inadmissible", adding that, although " * * * the IVth Amendment was written against the background of the general warrants in England and the writs of assistance in the American colonies," the Amendment "gives a protection wider than these abuses."

My colleagues criticize the Nueslein ruling as inconsistent with a statement, in the nature of *dictum*, in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 568, 72 L.Ed. 944. There the Court held that wiretapping did not violate the Amendment, basing its decision in large part on the fact that interception of the phone message involved no entry. The Court said: "There was no entry of the houses or offices of the defendants." This fact the Court noted five times. In passing, the Court also said, "There was no seizure. The evidence was secured by the use of the sense of hearing and that only." Citing Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647, the Court said that in that case there was "actual entrance into the private quarters of defendant and the taking away of something tangible. Here we have testimony only of voluntary conversations secretly overheard. The amendment itself shows that the search is to be of material things—the person, the house, his papers, or his effects. The description of the warrant necessary to make the proceeding lawful is that it must specify the place to be searched and the person or *things* to be seized." Since the Court found no entry, those remarks were, in every respect, superfluous. Doubtless for that reason, Vinson, J., twelve years later, disregarded those remarks when he wrote Nueslein. Nueslein has been cited by the Supreme Court in Harris v. United States, 331 U.S. 145, 153, 67 S.Ct. 1098, 1102, 91 L.Ed. 1399, as a "case in which law enforcement officials have invaded a private dwelling without authority and *seized evidence of crime*." [14]

And the Nueslein doctrine finds support in an earlier and a later decision: Both Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, and Zap v. United States, 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477 (order vacated on other grounds on rehearing 330 U.S. 800, 67 S.Ct. 857, 91 L.Ed. 1259) are based on the assumption that an illegal search occurs whenever government officials unlawfully gain access to a man's books in his home or office, and that it is immaterial that they get their information by reading, copying or photographing instead of by seizing the books and removing them. [15]

14. Emphasis added.

15. The Court in the Silverthorne case [251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319,] refused to allow government agents to raid a defendant's office and "study the papers [obtained in the raid] * * * copy them, and then * * * use the knowledge that it has gained to call upon the owners in a more regular form to produce them". The Court, per Holmes, J., rejected for once and all the argument "that the protection of the Constitution covers the physical possession but not any advantages that the government can gain over the object of its pursuit by doing the forbidden act." As recently as 1946, the Court [328 U.S. 624, 66 S.Ct. 1277, 1280, 90 L.Ed. 1477] dismissed as "a technicality" the seizure without warrant of a check during a legal inspection by government agents. Since the agents "could have taken photostats or made copies of the check and offered them in evidence without producing the originals", the seizure of the check added nothing to the govern-

In rejecting the reasoning of Vinson, J., in Nueslein, my colleagues ignore the unbroken line of decisions holding that the Fourth Amendment forbids either (a) illegal searches *or* (b) illegal seizures. "The things here forbidden are two: search and seizure", said Miller, J., concurring in Boyd v. United States, 116 U.S. 616, 641, 6 S.Ct. 524, 538, 29 L.Ed. 746. For this reason, federal courts have generally excluded any kind of evidence obtained as the result of an illegal search and not merely the physical introduction in evidence of things actually seized from the defendant. In Boyd v. United States, supra, 116 U.S. at page 627, 6 S.Ct. at page 530, the Court said that Lord Camden's opinion in Entick v. Carrington, 19 Howell's St. Trials 1029, was "sufficiently explanatory of what was meant by unreasonable searches and seizures" in the minds of the men who framed the Fourth Amendment. It is notable, therefore, that Lord Camden referred to the removal of papers as but an "aggravation" of the offense in unlawful search cases. "(E)very invasion of private property, be it ever so minute, is a trespass. * * * (W)here private papers are removed and carried away the secret nature of those goods will be an *aggravation of the trespass.*" * * * [16] I think, then, that it goes against 180 years of constitutional history to say that an illegal entry, for the purposes of procuring evidence, is not a violation of the Amendment unless something "tangible" is carried away.

Our highest court has never decided that a "search" is valid merely because made by the eyes or the ears and not the hands. Indeed so to hold would be to disregard the every-day meaning of "search," i.e., the act of seeking. In every-day talk, as of 1789 or now, a man "searches" when he looks or listens. Thus we find references in the Bible to "searching" the Scriptures (John V, 39); in literature to a man "searching" his heart or conscience; in the law books to "searching" a public record. None of these acts requires a manual rummaging for concealed objects. "It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property * * *." Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746.[16a]

So, just as looking around a room is searching, listening to the sounds in a room is searching. Seeing and hearing are both reactions of a human being to the physical environment around him—to light waves in one instance, to sound waves in the other. And, accordingly, using a mechanical aid to either seeing or hearing is also a form of searching. The camera and the dictaphone both do the work of the end-organs of an individual human searcher—more accurately.[17]

ment's case against the defendants and so did not violate the spirit of the Amendment. This was so only because the inspectors "obtained by lawful means access to the documents. * * * They were not trespassers. They did not obtain access by force, fraud, or trickery * * * the knowledge they acquired concerning petitioner's conduct under the contract with the government was lawfully obtained." See also United States v. McCunn, D.C.S.D.N.Y., 38 F.2d 246, 247; Lisansky v. United States, 4 Cir., 34 F.2d 846, 850, 67 A.L.R. 67; United States v. Mandel, D.C.Mass., 17 F.2d 270; Bowles v. Joseph Denunzio Fruit Co., D.C.W.D.Ky., 55 F.Supp. 9; Takahashi v. United States, 9 Cir., 143 F.2d 118; United States v. Dziadus, D.C.N.D. W.Va., 289 F. 837, 842.

16. Emphasis added.

16a. See also District of Columbia v. Little, 85 U.S.App.D.C. 242, 178 F.2d 13, 18, 13 A.L.R.2d 954, affirmed 339 U.S. 1, 70 S.Ct. 468, 94 L.Ed. 599: "Distinction between 'inspection' and 'search' of a home has no basis in semantics, in constitutional history, or in reason. 'Inspect' means to look at, and 'search' means to look for. To say that the people, in requiring adoption of the Fourth Amendment, meant to restrict invasion of their homes if government officials were looking for something, but not to restrict it if the officials were merely looking, is to ascribe to the electorate of that day and to the several legislatures and the Congress a degree of irrationality not otherwise observable in their dealings with potential tyranny."

17. A dictaphone, by its very nature, conducts an exploratory search for evi-

True, some look-searches and listen-searches do not run up against the Fourth Amendment. If an officer stays outside the house (or other precincts protected by the Amendment), he is not engaged in an "unreasonable" search when he looks through a window or listens at a keyhole. His activity is a "search," but not an unconstitutional one—because he has not, without the owner's consent, barged in on the constitutionally protected area. Thus a searchlight-beam focused on a ship's deck is not an unreasonable search, United States v. Lee, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202; nor is watching a house from an open field on which the officer is trespassing so long as his trespass does not extend to the house, Hester v. United States, 265 U.S. 57, 44 S. Ct. 445, 68 L.Ed. 898; even peeking through a transom is apparently cricket; McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153. Similarly government agents may listen to conversations in a defendant's room through a detectaphone attached to their own side of the wall. Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322. The Goldman case (unless as I shall later suggest, it may have been modified) teaches that men must expect official eavesdroppers, flashlight beams, spyglasses, wall-penetrating X-rays, and detectaphones —in short, every sort of attempt by officials on the outside to find out what goes on in the inside of one's house.

But the Supreme Court has stood firm in protecting the inviolability of the inside from the physical presence of official outsiders, absent the insider's consent. The Amendment acts as a bar at the doorstep against such uninvited intruders. A man still has the right to be secure in his home, after he has drawn the shades, soundproofed the walls, and insulated the building against X-rays. He does not have to keep up a 24-hour watch against official invaders. If the policeman at the window opens it up to come in for a better look, see Davis v. United States, 328 U.S. 582, 587, 598–599, 66 S.Ct. 1256, 90 L.Ed. 1453; if the agents have to break and enter the building in order to look over the transom of the owner's bedroom, Jackson, J., concurring in McDonald v. United States, 335 U.S. 451, 458–459, 69 S.Ct. 191, 93 L.Ed. 153; if the listening-device is planted inside the defendant's room rather than on the adjoining wall, Goldman v. United States, 316 U.S. 129, 134, 62 S.Ct. 993, 86 L.Ed. 1322— in all such instances a violation of the Fourth Amendment occurs. See Raine v. United States, 9 Cir., 299 F. 407, 411; Foley v. United States, 5 Cir., 64 F.2d 1, 4; United ed States v. Phillips, D.C.N.D.N.Y., 34 F.2d 495, 499.

In any such case, the man is no longer secure in his house: the outsiders have moved in on him. The Goldman case drew this distinction prettily—almost as if the Court had anticipated this very case. There the officers, illegally entering a room of Shulman, one of the defendants, planted a "listening apparatus" (a dictaphone) in that room with wires running to the adjacent room, which the officers entered lawfully. The dictaphone failed to work. The officers then resorted to a detectaphone which had no wires connecting it with Shulman's room and which was wholly within the adjacent room. Solely by means of this outside detectaphone, the officers heard defendants' incriminating conversation (carried on in Shulman's room) to which the officers testified. The defendants, said the Court, "contend that the trespass committed in Shulman's office when the listening apparatus was there installed, and what was learned as a result of that trespass, was of some assistance on the following day in locating the

---

dence of a house-owner's guilt. Such exploratory searches for evidence are forbidden, with or without warrant, by the Fourth Amendment. Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231. A search warrant must describe the things to be seized, and those things can be only (1) instrumentalities of the crime or (b) contraband. Speech can be neither. A listening to all talk inside a house has only one purpose—evidence-gathering. No valid warrant for such listening or for the installation of a dictaphone could be issued. Such conduct is lawless, an unconstitutional violation of the owner's privacy. The fact that the conversations here took place after On Lee's arrest emphasizes the fact that their only use would be to convict him.

receiver of the detectaphone in the adjoining office and this connection between the trespass and the listening resulted in a violation of the Fourth Amendment. Whatever trespass was committed was connected with the installation of the listening apparatus [the dictaphone]. As respects it, the trespass might be said to be continuing and, if the apparatus had been used it might, with reason, be claimed that the connecting trespass was the concomitant of its use." [316 U.S. 129, 62 S.Ct. 996].

The Goldman case distinction is crucial here: If the government agent, on the outside, unaided by any device smuggled into On Lee's premises, had heard what On Lee said, the agent's conduct would have been unethical (perhaps even unlawful under state law) but not unconstitutional.[18] The microphone, however, was brought into On Lee's establishment without his permission. It was just as if the agent had overheard the conversation after he had sneaked in when On Lee's back was turned and had then hidden himself in a closet. All the agent's subsequent evidence-gathering was a result of, a concomitant of, the unlawful invasion. As recognized in Goldman, such behavior is altogether different from that of an officer merely listening in an adjoining room which is no part of the defendant's constitutionally protected precincts. Here the agent, in effect, came inside that area, and did so without On Lee's consent.

The situation is no different than if Chin Poy had secretly installed the radio inside the house. On Lee agreed to Chin Poy's presence in his laundry; he did not agree, nor was he given the chance to disagree with what, for all practical purposes, was the presence of someone else altogether. The invading microphone enabled a third person, about whom On Lee knew nothing, to be present at the conversations. It accomplished the same purpose as if, and should therefore be treated as if, the agent had smuggled himself into the room to listen behind closed doors, or as if the agent had been a midget and had been hidden in a bag carried by Chin Poy onto On Lee's premises.

I grant that, as long as the *Goldman* doctrine endures the domain of Fourth Amendment privacy will be rather restricted, and that it will become more so as new distance-conquering devices for seeing, hearing, and smelling are invented. But I believe that, under the Amendment, the "sanctity of a man's house and the privacies of life" still remain protected from the uninvited intrusion of physical means by which words within the house are secretly communicated to a person on the outside. A man can still control a small part of his environment, his house; he can retreat thence from outsiders, secure in the knowledge that they cannot get at him without disobeying the Constitution. That is still a sizable hunk of liberty—worth protecting from encroachment. A sane, decent, civilized society must provide some such oasis, some shelter from public scrutiny, some insulated enclos-

---

18. Although customers may enter a man's place of business at will, it is still as immune from illegal search and seizure as his kitchen or his bedroom. Many of the leading Supreme Court cases on search and seizure have involved places of business. Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647; Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319; Go Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374; United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877; Government agents may not break into a store any more than they may break into a home, or force entry against the owner's will. United States v. Rabstein, D.C.N.J., 41 F.2d 227. They may, of course, enter in the same manner as customers and observe what is going on, including criminal acts. Dillon v. United States, 2 Cir., 279 F. 639. They may seize contraband in plain sight. But they may not enter the establishment and once inside conduct an unauthorized search or seize articles not in plain sight. Thus officers entering a drugstore to make a routine inspection of records could not lawfully sneak into an enclosure marked "Private," and seize illegally stored liquor hidden inside. In re Lobosco, D.C.E.D. Pa., 11 F.2d 892. A businessman issues an invitation to the public to come into his establishment, but once people come inside he can control their activities while on his premises, and he has the right at any time to order them out. If they stay, after he has ordered them to leave, they become, as of that time, trespassers on his property.

ure, some enclave, some inviolate place which is a man's castle.[19] Were my colleagues correct, the Fourth Amendment would be inoperative if a government agent entered a house covered with a "cloak of invisibility"—a garment which ingenuity may soon yield.

This brings me to my colleagues' second argument which runs thus: The introduction of the microphone, without On Lee's consent, did not render unconstitutional the act of the distant agent in listening to the conversation; for that agent was just like a spy who, gaining entrance by concealing his identity, hears and testifies to an admission made by a criminal; testimony so obtained by a spy (say my colleagues) has never been held inadmissible under the Fourth Amendment.

All else aside, this argument not only wipes out the Goldman case distinction but also ignores the distinction between (a) entry with the owner's consent when the consent is procured by deception, and (b) lack of any consent to the entry. This case is of the latter kind. For all practical purposes (as I have tried to show), the agent entered On Lee's premises without On Lee's knowledge and therefore minus his consent. That uninvited entry constituted just as much of a constitutional infringement as if the agent had forced his way in. To hold otherwise is to turn the Amendment into a sorry joke. It is to say to a police-officer: "Take a hint. Don't bludgeon your way in. Wait till the owner is not looking, and then skulk in. The Constitution forgives a sneak's entry."

This is not at all what the courts have said when they have given a limited sanction to evidence obtained by spies who, by lies, have procured an owner's consent both to enter and to acts done by the spies after entry. Typically, in such a case, the owner, engaged in an illegal enterprise, expressly or tacitly invited prospective customers (or the like) to enter without being required to satisfy any conditions; the invitation was not conditioned on the entrant's not being a government official; the spy gained entry because the owner mistakenly trusted that this seeming customer would not disclose his observations to the government. These were the facts in Davis v. United States, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453, and in Blanchard v. United States, 5 Cir., 40 F.2d 904. Trupiano v. United States, 334 U.S. 669, 68 S.Ct. 1229, 92 L.Ed. 1663, relied upon by my colleagues to support their spy analogy, involved an informer who was hired by the defendants as a workman in an illegal still and who reported his observations to the police. The workman, like the customers, had been invited by the owner onto the premises for a specific reason; and the former's entrance was not illegal because of the use to which he put his observations.

It is one thing to hold that the Amendment does not safeguard a man from such errors in judging the character of those whom he lets into his house; it is another to hold that the Amendment does not protect him from officers who get in when he does not know it. We shudder at the nocturnal "knock at the door" by searchers armed with no warrants. How much worse is a secret search by a knockless, sneaky, unknown entrant. In the first case, the citizen has the opportunity to question the searcher's authority, perhaps to dissuade or resist. In the second, he is powerless against an unseen snooper.[20]

19. The famous maxim about an "Englishman's house is his castle," was perhaps a concept quite foreign to common law. Radin, pointing out that the common law recognized no such rule against the processes of the King, says that the true origin of the sanctity-of-a-man's-house idea lies in the Roman law where the maxim was honored in practice as well as theory: No Roman citizen could be dragged from his home by any law enforcement official. Digest, 2, 4, 18. The idea, says Radin, appears first in Gaius' Commentaries on the Twelve Tables, and was later picked up by Cicero, De Doma Sua, § 109. Radin further notes that the idea of the inviolability of the house was also part of German and French law. According to Radin, the lawyers in the colonies were well acquainted with Roman and Continental legal writings. Radin, Rivalry of Common Law and Civil Law Ideas, in American Colonies, 423–427 in Law, A Century of Progress, 1835–1935.

20. See United States v. Jeffers, 72 S.Ct. 93, 95, as to officers whose "intrusion was conducted surreptitiously * * *."

The spy cases are, at best, difficult to reconcile with Gouled v. United States, 255 U. S. 298, 41 S.Ct. 261, 65 L.Ed. 647, where it was held that a government agent, paying defendant a "friendly visit," conducted an illegal search when he went through defendant's papers without defendant's knowledge. Assuming, however, that Gouled has been virtually overruled, the spy cases must, I think, be deemed to go to the very edge of unconstitutionality. No upper court, up to today, has gone further. In Fraternal Order of Eagles v. United States, 3 Cir., 57 F. 2d .93, 94,—overruling in effect United States v. Wainer, D.C.W.D.Pa., 49 F.2d 789 cited by my colleagues—entrance was limited to a special class possessing credentials, and the government spies used stolen credentials which gave them the false appearance of members of that special class. The court held inadmissible the. evidence they procured.[21]

The practice of broadcasting private inside-the-house conversations through concealed radios is singularly terrifying when one considers how this snide device has already been used in totalitarian lands. Under Hitler, when it became known that the secret police planted dictaphones in houses, members of families often gathered in bathrooms to conduct whispered discussions of intimate affairs, hoping thus to escape the reach of the sending apparatus.[22] Orwell, depicting the horrors of a future completely regimented society, could think of no more frightening instrument than to be employed than the "telescreen" compulsorily installed in every house. "The telescreen," he writes, "received and transmitted simultaneously. Any sound that Winston made, above the level of a very low whisper would be picked up by it; moreover, so long as he remained in the field of vision which the metal plaque commanded, he could be seen as well as heard. There was of course no way of knowing whether you were being watched at any given moment. How often, or on what system, the Thought Police plugged in on any individual wire was guesswork. It was even conceivable that they watched everybody all the time. But at any rate they could plug in your wire whenever they wanted to. You had to live, did live, from habit that became instinct, in the assumption that every sound you made was overheard, and, except in darkness, every movement scrutinized." [23] Such a mechanical horror may soon be the dubious gift of applied science. My colleagues' decision, by legitimizing the use of such a future horror, invites it.[24] I think that the decision is

21. The Court said, in passing, that their entrance constituted a search: "The object of the entry was to discover as much as possible and to use what they could see as a basis of an application for a search warrant. When the agents first entered they searched with their eyes, and saw the very thing that they were looking for. * * * The government may not make an entry by means of false representations, search as fully as possible without arousing suspicion, and later make the fruit of that entry and search the basis of what otherwise might be a legal search and seizure."

See also People v. Dent, 371 Ill. 33, 19 N.E.2d 1020, where the court suppressed evidence obtained by policemen who knocked at defendant's door and were told to "Come In." After entering, they saw illegal number slips on the table and seized them. The search and seizure were held unconstitutional (under Illinois law) because the policemen had not volunteered their identities and the purpose of their visit before accepting the defendant's invitation to enter.

22. See Bramstedt, Dictatorship and Political Police (1945) 144:

"Visitors were often led by their friends into the bathroom, a room not easy to tap, and there they exchanged the latest news in whispers. Diplomats and officials met in one of the public parks in order to escape eavesdroppers— mechanical and otherwise. As a result in many houses a tea cosy was put around the telephone receiver as a wise preventative measure. During the war people in Berlin who wanted to talk freely still either disconnected their telephones from the wall-plugs or put them under their desks."

23. Orwell, "1984," p. 4.

24. Such a precision-minded society as Orwell describes is, fortunately, not our only alternative. We can knowingly sacrifice 100% accuracy in crime-detec-

wrong and that the invitation should not be issued.

2. I consider the decision wrong because of the Fourth Amendment. I am not sure it is correct even aside from the Amendment. I have in mind the post-Olmstead doctrine of McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, and Anderson v. United States, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829, i.e., that the federal courts will not receive evidence obtained by federal officers through violation of federal or state laws.[25]

3. Apart from the radio evidence, I think the conviction should be reversed on still other grounds. Early in the trial, a detective was allowed to repeat the accusatory statement of Ying (On Lee's alleged co-conspirator) made against On Lee after his arrest, when he was present. The judge received this evidence on the theory that, since On Lee had not denied the statement, he had thus admitted by silence what he had not denied. The judge was wrong. In United States v. Lo Biondo, 2 Cir., 135 F.2d 130, we held that a defendant need not deny any accusations made to his face after his arrest, and that his silence in such circumstances cannot be construed as an admission of his guilt. The trial judge in the instant case later partly realized his mistake, and, by his charge to the jury, sought to correct the misimpression. In a case where the evidence against the defendant was particularly substantial or convincing, I might agree that such an error is harmless, if thus subsequently corrected. But in this case, the evidence was anything but overwhelming, and a misimpression of this sort might easily sway the jury toward conviction.[26] To make matters worse, the judge here, in seeking to correct his error, positively harmed the defendant's case in the jury's eyes: The judge announced that, if the defendant had denied his guilt *before arrest,* he did not have to repeat his denials later after arrest.[27] In the charge, this was the only ex-

---

25. I recognize that my suggestion would mean that the Olmstead and Goldman cases would be in effect overruled, but on non-constitutional grounds. Professor Morgan suggests that this result would be consistent with the McNabb holdings. Morgan, The Law of Evidence, 1941–1945, 59 Harv.L.Rev. 481, 535–541 (1946).

It should be noted that the invasion of On Lee's privacy involved a trespass and was therefore a far more serious wrong than the non-trespassing eavesdropping involved in the Goldman case. See A. L. I., Restatement, Torts, § 168; Prosser on Torts, § 18 (1941).

26. "The naive assumption that prejudicial effects can be overcome by instructions to the jury, * * * all practicing lawyers know to be unmitigated fiction." Jackson, J., concurring in Krulewitch v. United States, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790. See also Skidmore v. Baltimore & Ohio R. Co., 2 Cir., 167 F.2d 54.

27. The full charge on this issue reads: "I will charge the jury that *if before*

the arrest the defendant made the statement to Monahan or any other agent that he did not make the sale, that he did not make the delivery, that he did not possess the opium, if he denied all that to Monahan or the other agents, and after the arrest * * * was told or heard Gong saying: 'You gave it to me; you delivered it to me,' then under the circumstances the defendant On Lee could remain silent and his silence would not be regarded as tacit admission that he did so.

"The general rule is that when a statement tending to incriminate one accused of committing a crime is made in his presence and hearing and such statement is not denied, contradicted or objected to by him, both the statement and the fact of his failure to deny are admissible in a criminal prosecution against him, as evidence of his acquiescence in its truth.

"Now I modify that by this consideration: if *before the arrest* he denied that he did it and then after the arrest in the presence of the people to whom he denied it, Monahan and the others, if in their presence he kept quiet when Gong told him 'I got it from you; you delivered it to me,' in that case I would say that silence did not constitute and acquiescence cannot be regarded as an admission, because having denied it before, he did not have to deny it again.

---

tion to freedom. See London Times Lit. Supp., Oct. 12, 1951, p. 642 "if you want to * * * enjoy some personal freedom * * * in the new * * * society * * * you must be prepared to live in the interstices of the society and to put trust in its imprecisions."

ception to the general rule of guilt by silence. Since the record contained no evidence that On Lee had denied guilt *before* arrest, the jury might well have believed that On Lee did not come within any exception and must therefore have admitted his guilt by remaining mute.

Such an error should be deemed harmless, if at all, only where the government's case against the defendant is "strong." [28] But here it was not. As already noted, the pivotal evidence was the agent's testimony about conversations he overheard. The following is therefore important: Chin Poy, the informer, was not called by the government and therefore did not himself testify to those conversations. Had the agent attempted to testify to what Chin Poy told him of these conversations, his testimony would have been excluded as hearsay— weak hearsay, at that, since no reason was given for not calling Chin Poy. The sole basis of receiving the agent's testimony was that he stated he had heard the conversations, i.e., was not merely retelling what Chin Poy had told the agent out of court. Yet, in the course of cross-examination of the agent, it came out that he had to rely on Chin Poy's out-of-court statements about the conversations. Consider these facts: (a) The agent's receiving set, on at least one occasion, was supposed to have been hooked up with a recording device in a nearby truck which could have made a record that could have been played to the jury. But the agent testified that he had made no such record because "the recorder was not working that evening." (b) He also testified that the kind of radio-device he utilized often failed to work properly because of noisy surroundings or transmitted unintelligible noises. (c) He further testified that he did not take notes of all the conversations while they were going on. (d) Only an hour or so later, did he make notes and memoranda concerning what he had heard. And the memo was made after comparing his notes with those of Chin Poy, so that the agent's memo was, at best, a collaborative product. (e) To make matters far worse, the agent did not use his notes and memoranda to refresh or prompt his recollection,· although he deliberately tried to give the appearance of doing so. For, during his direct testimony, he kept referring to a written statement. On cross-examination, however, he confessed that this statement was not his own—since his own notes and memos, he said, had been "destroyed" or "filed away." The paper he used to refresh his recollection in testifying was a written statement made by Chin Poy of his recollection of the conversations. So that, in order to testify, the agent had to use out-of-court statements of Chin Poy, a man never seen or heard by the jury and never subjected to cross-examination. Surely a case resting on the agent's testimony is not "strong."

There was a denial there and he did not have to tell the people to whom he had already denied it that it was not so if the statement was made in his presence. He has denied it once and that is sufficient." Emphasis added.

28. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557; Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314.